**IN the Matter of the COMPLAINT OF PMD ENTERPRISES INC., as Owner of the Vessel Beth Dee Bob, for Exoneration from and Limitation of Liability.**

**Civ. No. 00–0161(GEB).**

United States District Court, D. New Jersey.

Aug. 23, 2002.

Marvin I. Barish, Esquire, Marvin I. Barish Law Offices, P.C., Camden, NJ, for the Estate of Edward McLaughlin.

David Hornig, Esquire, Julia M. Moore, Esquire, Nicoletti, Hornig, Campise & Sweeney, Esqs., Hackensack, NJ, for PMD Enterprises, Inc.

### MEMORANDUM OPINION

BROWN, District Judge.

This matter comes before the Court *sua sponte* upon the Court's receipt of a letter from counsel for PMD Enterprises, Inc., alleging various ethical violations on the part of counsel for the Estate of McLaughlin, Marvin I. Barish, arising from his investigator's alleged improper contact with John Graziosetta, a material fact witness and designated member of PMD's litigation control group. The Court has jurisdiction over this admiralty action pursuant to 28 U.S.C. § 1333(1). For the reasons discussed below, Mr. Barish's *pro hac vice* admission in this Court is hereby revoked.

## I. FINDINGS OF FACTS AND PROCEDURAL HISTORY

### A. PROCEDURAL HISTORY

The background and procedural history are sufficiently set forth in this Court's October 19, 2001 Memorandum Opinion and will not be repeated herein except as necessary.

This action arises from the sinking of the clamming vessel, the *Beth Dee Bob,* on January 6, 1999, approximately fourteen miles off the coast of New Jersey. The Captain, Edward McLaughlin, and three crew members, Jay P. Bjornestadt, Grady Gene Coltrain, and Roman Tkaczyk, died as a result of the accident. PMD Enterprises is the registered owner and operator of the *Beth Dee Bob* and the employer of its crew members. The *Beth Dee Bob* left Point Pleasant on January 5, 1999. As scheduled, the vessel began heading back to port on the afternoon of January 6, 1999 carrying a full load of seventy cages of clams. At 5:40 p.m., the crew made a distress call that the vessel was taking on water. The vessel apparently capsized or sank quickly enough so as to prevent further communication from the crew and to prevent them from boarding a liferaft. The cause of the accident is disputed by the parties.

Plaintiff filed a wrongful death action in her representative capacity in the Eastern District of Pennsylvania against PMD on March 31, 1999. PMD subsequently filed a petition for limitation of liability in the Eastern District of New York pursuant to the Limitation of Liability Act, 46 U.S.C.App. §§ 181 *et seq.,* thereby staying all individual actions against PMD. The limitation action was transferred to the Eastern District of Pennsylvania and consolidated with the wrongful death action against PMD. All four deceased crew members filed wrongful death claims.[1]

The Eastern District dismissed McLaughlin's complaint against PMD for lack of personal jurisdiction and transferred the PMD limitation action and the Cape May Foods action to the District of New Jersey. On December 1, 1999,

---

1. The estates of all crew members except Captain McLaughlin settled their claims against PMD as to liability.

McLaughlin filed a separate wrongful death action against Peter Lamonica in the District of New Jersey generally alleging Lamonica's negligence was the cause of Captain McLaughlin's death. The action against Lamonica was transferred to this Court and consolidated with the limitation action and the action against Cape May. PMD subsequently sought and was granted leave to file a counterclaim sounding in negligence against Captain McLaughlin for the loss of the *Beth Dee Bob*.

Dispositive motions were decided on October 19, 2001. The parties filed motions *in limine* and the Court reserved decision as to McLaughlin's motion to dissolve the injunction and PMD's motion to strike McLaughlin's jury demand. On January 30, 2002, Magistrate Judge Wolfson denied McLaughlin's application to reopen discovery and ordered the parties to submit pretrial orders by February 8, 2002.

On February 6, 2002, this Court received a letter from counsel for PMD containing allegations of improper contact with a witness and witness tampering by counsel for McLaughlin, Marvin I. Barish. PMD alleges that Barish, through his investigator Raphael Juliano, improperly contacted John Graziosetta, a member of PMD's litigation control group and a key fact witness of PMD, and offered to hire him at a rate of $100/hour to review and organize certain documents and records pertaining to the repair and maintenance of the *Beth Dee Bob*. On February 8, 2002, the Court entered an Order scheduling an evidentiary hearing for February 15, 2002 to consider PMD's allegations.[2] The Court now makes the following findings of fact.

## B. FINDINGS OF FACT

1. On February 15, 2002, the Court heard testimony from John Graziosetta and Raphael Juliano regarding the alleged improper contact and heard argument from the parties. To the extent that the testimony of the witnesses conflicts, this Court finds the testimony of Graziosetta to be credible as the Court can conceive of no reason or motivation for Graziosetta to be untruthful. The Court finds Juliano's testimony to be self-serving and simply not believable on several points which will be discussed more fully below. Moreover, Juliano's testimony was often inconsistent and his demeanor during his testimony often bordered on belligerent.

2. Juliano is a private detective, licensed in Delaware, who has been retained on more than one occasion as an investigator by Marvin I. Barish Law Offices, P.C. Transcript of February 15, 2002 (Trans.) at 40; Juliano Affidavit (Aff.) ¶ 1.

3. Juliano testified that he was instructed by Barish in late December 2001 to obtain information on repairs and services performed on the *Beth Dee Bob* by various vendors. Trans. at 41; Aff. ¶ 2. Juliano claims that Barish did not specifically instruct him to contact John Graziosetta. Trans. at 41.

4. In the course of his investigation of the vendor services, Juliano maintains that he spoke with Ski, of Flag Services, regarding certain work performed on the *Beth Dee Bob*. Juliano inquired as to the meaning of certain invoices. Ski told Juliano that Graziosetta would be able to decipher the documents. Trans. at 42–43.

5. Graziosetta is a former employee of PMD who worked as a port engineer on the commercial fishing vessels, and was

---

**2.** Given the potential implication of criminal statutes prohibiting witness tampering the Court notified the United States Attorney's Office for the District of New Jersey and an individual from that office was present for the evidentiary hearing.

primarily responsible for maintaining the engine on the *Beth Dee Bob. Id.* at 20.

6. Graziosetta is a material fact witness for PMD and has been designated by Barish as a hostile witness. *See* PMD's February 6, 2002 Letter at 2, exhibit 2.

7. Graziosetta was designated as a member of PMD's litigation control group and identified as such in correspondence from PMD's counsel to Barish. *Id.* at exhibit 1.

8. Juliano testified that when Ski mentioned Graziosetta he had no idea who he was referring to. Trans. at 44. This assertion is not credible and is directly contradicted by Juliano's subsequent testimony on cross-examination. Juliano previously performed investigative services for Barish with respect to the *Beth Dee Bob.* Juliano previously attended the Coast Guard hearing on this matter and was present for Graziosetta's testimony. Trans. at 68–69. Juliano admitted that he was aware Graziosetta was represented by PMD's Counsel at the Coast Guard hearing. *Id.* at 69. Juliano also admitted reading Graziosetta's deposition in the offices of the Barish firm. *Id.* at 69–70.

9. Juliano claims to have had no knowledge that Graziosetta was a member of PMD's litigation control group or to have any understanding of the term litigation control group. *Id.* at 70–71.

10. Juliano subsequently went to Eckel's Garage to look for Graziosetta and left a phone number where Graziosetta could reach him. *Id.* at 45.

11. Juliano told Rob Eckels that he wanted to speak to Graziosetta because he needed some engine work done and he was referred to Graziosetta by Ski. *Id.* at 23.

12. On February 4, 2002, Graziosetta called Juliano and Juliano admitted that the call was regarding the *Beth Dee Bob* and that he worked for Barish. *Id.* at 23–24. Graziosetta stated that Juliano said that Barish would "like you to ... come up and meet with us and go over some information that we can't decipher or make heads or tails out of as far as different service reports, some technical stuff about the propeller. ..." *Id.* at 24. Juliano told Graziosetta that, "this is all up and above board. Mr. Barish asked the Judge and had it okayed with him that we can do this and ... you'll be compensated for—we'll be hiring you for your time. ... I'm talking $100/hour for like two weeks."[3] *Id.* at 24. Graziosetta said he would think it over and get back to him. *Id.*

13. Juliano gives a somewhat different account of his conversation with Graziosetta. Juliano testified that he told Graziosetta that they had some documents that they were trying to decipher and asked him if he could help him to "make some sense out of them." Trans. at 47–49. Juliano offered to compensate Graziosetta for his time expended in reviewing the documents. *Id.* at 49. Juliano maintains that Graziosetta said that his time was worth $100/hour and Juliano responded by saying, "if that's what your time is, that's what your time is." *Id.*

14. On cross-examination, Juliano denied having made an offer or having the authority to offer to pay Graziosetta for his time, but on direct Juliano clearly indicated that he made such an offer of compensation and considered it to be commonplace. *Id.* at 49; 58–59; 61.

15. Juliano testified that Barish was not aware of his attempt to contact Graziosetta until 30 minutes after his conver-

---

**3.** Obviously, contrary to Juliano's representation, Barish never in fact requested permission from this Court and this Court never "okayed" the improper contact.

sation with Graziosetta. *Id.* at 52. This statement conflicts with Juliano's testimony regarding Barish's oversight of his investigation. Juliano testified that the course of his investigation from talking to Eckels Garage, talking to Ski and hearing about Graziosetta, and then going back to Eckels to talk to Graziosetta took about a month and a half. *Id.* at 45. Juliano testified that during his investigation in December, January and into February 2002, he regularly reported to Barish on the progress of the investigation and informed him who he had spoken to and who he planned to speak to. *Id.* at 74. Nevertheless, Juliano maintains that he never mentioned Graziosetta to Barish. *Id.*

16. Juliano admitted that he had also offered compensation to Tom Napalatano, another fact witness, for assistance other than time spent physically traveling to the courthouse and testifying. *Id.* at 67.

17. On a previous occasion in which he was working for Barish, Juliano contacted and got a statement from a witness represented by counsel in violation of the Pennsylvania RPC 4.2. *Id.* at 77–78; *see Belote v. Maritrans Operating Partners, L.P.,* Civ. No. 97–3993, 1998 WL 136523 (E.D.Pa. March 20, 1998). Barish personally contacted an employee of a defendant in violation of Pennsylvania RPC 4.2 in *Garrett v. National Railroad Passenger Corp.,* Civ. No. 89–8326, 1990 WL 122911 (E.D.Pa. Aug. 14, 1990).

18. Based upon Graziosetta's testimony, Barish knew that Juliano would contact Graziosetta in the course of his investigation.

19. Barish failed to take any action, even after his previous experiences with Juliano in the *Belote* matter, to ensure that Juliano would not contact persons represented by counsel.

20. Barish did not instruct Juliano as to which persons he could have no personal contact with during the course of his investigation. Trans. at 70–71.

21. Barish approved the payment of compensation to fact witnesses for reasons other than their time lost traveling to Court and physically testifying:

22. Barish's conduct, through his investigator, needlessly wasted the time and resources of this Court and his adversary, and has prejudiced both parties by delaying this matter from proceeding to trial.

23. The sum of Barish's argument was that he did not need Graziosetta to win the case, he did not direct Juliano to contact Graziosetta and he had no knowledge that Juliano contacted Graziosetta. Trans. at 84–88.

### C. BARISH'S HISTORY OF MISCONDUCT IN THE COURTS OF THE THIRD CIRCUIT

Counsel for the Estate of McLaughlin, Marvin I. Barish, has a lengthy and well documented history of misconduct in the District Courts of the Third Circuit. As stated by Judge Politan, "Mr. Barish has in recent years left a trail of mistrials in his wake." Mr. Barish's prior behavior provides a lens through which the instant conduct should be examined and as such, is relevant to the issue presented herein.

The first reported instance of Barish's misconduct is in *Garrett v. National Railroad Passenger Corp.,* 1990 WL 122911. In *Garrett,* Barish, acting as counsel for the plaintiff, contacted an employee of the defendant and obtained a statement from him without giving notice to defendant's counsel. *Garrett,* 1990 WL 122911, at *1. The court found that the contact violated Pennsylvania RPC 4.2 and precluded plaintiff from utilizing the statement or any evidence derived therefrom. *Id.* at *3. In so doing, the court rejected Barish's argument (which he also makes here) that § 60 of the Federal Employers' Liability

Act ("FELA") authorizes counsel to contact employees of a Railroad in violation of RPC 4.2. *Id.* at *2.

In *Patchell v. National Railroad Passenger Corp.*, Civ. No. 90–4745, WL 799399, *4–7 (E.D.Pa. July 31, 1992), *rev'd on other grounds*, 107 F.3d 7 (3d Cir.1997), the court granted defendant's motion for a new trial in part due to Barish's highly improper remarks at closing argument. In an unpublished opinion in *McEnrue v. N.J. Transit Rail Ops.*, Civ. No. 90–4728, at 17–27 (D.N.J. Sept. 30, 1993), Judge Simandle granted defendant's motion for a new trial "on the basis of Mr. Barish's grossly uncivilized behavior at trial." *Kohlmayer v. Nat'l. Railroad Passenger Corp.*, 124 F.Supp.2d 877, 880 (D.N.J.2000) (discussing *McEnrue* in detail). Judge Simandle found that Barish had made inappropriate remarks in his closing and had admittedly cursed at his adversary on the record. *See id.* Judge Simandle ultimately concluded that the "facts of Mr. Barish's misconduct, and his utterly belligerent conduct toward opposing counsel, when added together, justified ending the case by mistrial." *Id.* (quoting *McEnrue*, 90–4728 at 26).

In 1995, the court set aside a jury verdict in favor of Barish's client in *Spruill v. Nat'l. R.R. Passenger Corp.*, Civ. No. 93–4706, 1995 WL 534273, *9 (E.D.Pa. Sept. 5, 1995) due to the substantial record of Barish's improper conduct at trial. The court in *Spruill* painstakingly recounted Barish's inappropriate opening statement, interruption of defendant's opening, excessive leading of witnesses on direct examination despite the court's multiple admonitions, signaling the plaintiff and otherwise interfering with defense counsel's attempts to cross-examine him, improper cross-examination, arguing with the court regarding its rulings, multiple inappropriate comments during closing argument and rebuttal, and interruption of defendant's closing argument. *See id.* at *1–8.

This Court has denied *pro hac vice* admission to Barish on at least two prior occasions. In *Natusch v. Consolidated Rail Corp.*, Civ. No. 94–2635 (D.N.J.1996), Chief Judge Bissell denied Barish *pro hac vice* admission based on his past conduct. Chief Judge Bissell advised Barish that he should consider the denial of *pro hac vice* admission as a warning that in the future he must improve his conduct to be granted the privilege of practicing in this Court. *See Kohlmayer*, 124 F.Supp.2d at 881 (discussing *Natusch*, 94–2635). Also, in *Kohlmayer*, Judge Politan affirmed the denial of *pro hac vice* admission to Barish by Magistrate Judge Hedges. *Id.* at 884. In so ruling, Judge Politan engaged in and relied upon a thorough review of Barish's prior misdeeds. *Id.* at 880–882.

Barish failed to follow Chief Judge Bissell's advice as he was once again embroiled in an ethical dispute in 1998 in *Belote v. Maritrans Operating Partners*, Civ. No. 97–3993, 1998 WL 136523 (E.D.Pa. March 20, 1998). In *Belote*, Barish sent Juliano to speak with an employee of the defendant, the captain of the barge on which plaintiff alleged he was injured, without notice to defendant's counsel. *Belote*, 1998 WL 136523 at *1. Following the holding in *Garrett*, the court found that Barish violated Pennsylvania RPC 4.2 and rejected Barish's oft-asserted claim that § 60 of FELA preempts RPC 4.2. *Id.* at *4–6.

Finally, in *Comuso v. Nat'l. R.R. Passenger Corp.*, Civ. No. 97–7891, 2000 WL 502707 (E.D.Pa. April 25, 2000), *appeal dismissed*, 267 F.3d 331 (2001), Barish's improper conduct resulted in his disqualification. During a recess on the second day of trial, Barish approached defense counsel with his fists cocked and proceeded to launch into a verbal tirade in which he

threatened to kill counsel, and called him a "fat pig" four times, a "mother f——," and "lower than whale s—." *Id.* at *1. Barish's assistant, Randy Zevin had to physically restrain him from attacking defense counsel. *Id.* The court declared a mistrial, disqualified Barish, and imposed fees and costs of the defendant against him for his outrageous behavior. *Id.* at *6–*7.

## II. DISCUSSION

### A. STANDARD FOR THE EXERCISE OF THE COURT'S INHERENT POWERS

Courts have the *"inherent* authority to impose sanctions upon those who would abuse the judicial process." *Republic of the Philippines v. Westinghouse Elec.,* 43 F.3d 65, 73 (3d Cir.1994) (emphasis in original) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43–44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). These powers are " 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' " *Chambers,* 501 U.S. at 43, 111 S.Ct. 2123 (quoting *Link v. Wabash R. Co.,* 370 U.S. 626, 630–631, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)).

The Supreme Court has cautioned, however, that "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44, 111 S.Ct. 2123. The Third Circuit has required that district courts make certain findings to "ensure that the sanction is tailored to address the harm identified." *Republic of the Philippines,* 43 F.3d at 74. First, the court must examine the conduct at issue and explain why a sanction is justified. *See id.* In so doing, the court should consider factors such as whether the conduct is part of a pattern of wrongdoing; the severity of the infraction; and the level of harm or prejudice to the adversary. *See id.* Second, the court must consider the range of available sanctions and explain why it has chosen the particular sanction. *See id.*

### B. NEW JERSEY RULES OF PROFESSIONAL CONDUCT 4.2 AND 1.13[4]

Rule 4.2 of the New Jersey Rules of Professional Conduct (RPC) provides:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows, or by the exercise of reasonable diligence should know, to be represented by another lawyer in the matter, including members of an organization's litigation control group as defined by RPC 1.13, unless the lawyer has the consent of the other lawyer or is authorized by law to do so, or unless the sole purpose of the communication is to ascertain whether the person is in fact represented by counsel. Nothing in this rule shall, however, preclude a lawyer from counseling or representing a member or former member of an organization's litigation control group who seeks independent legal advice.

RPC 1.13(a) defines the parameters of organizational representation as follows:

> A lawyer employed or retained to represent an organization represents the organization as distinct from its directors, officers, employees, members, shareholders or other constituents. For the purposes of RPC 4.2 and 4.3, however, the organization's lawyer shall be deemed to represent not only the orga-

---

4. Local Civil Rule 103.1(a) provides that "The Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court shall govern the conduct of the members of the bar admitted to practice in this Court, subject to such modifications as may be required or permitted by federal statute, regulation, court rule or decision of law."

nizational entity but also the members of its litigation control group. Members of the litigation control groups shall be deemed to include current agents and employees responsible for, or significantly involved in, the determination of the organization's legal position in the matter whether or not in litigation, provided, however, that "significant involvement" requires involvement greater, and other than, the supplying of factual information or data respecting the matter. Former agents and employees who were members of the litigation control group shall presumptively be deemed to be represented in the matter by the organization's lawyer but may at any time disavow said representation.

■ The purpose of RPC 4.2 is to "preserve[ ] the integrity of the attorney client relationship and the posture of the parties within the adversarial system . . . .[and] to protect the lay person who may be prone to manipulation by counsel." *Michaels v. Woodland*, 988 F.Supp. 468, 470 (D.N.J. 1997) (quotations omitted). RPC 4.2 clearly places a burden on the attorney to determine in the first instance whether an individual is a member of the litigation control group. *See Andrews v. Goodyear Tire & Rubber Co., Inc.*, 191 F.R.D. 59, 77 (D.N.J.2000). In so doing the attorney or his agent may speak with the witness without contacting his adversary if "the sole purpose of the communication is to ascertain whether the person is in fact represented." RPC 4.2. Moreover, RPC 1.13(a) provides that person may explicitly disavow any such representation.

Barish does not dispute that the contact occurred. Instead, Barish argues: (1) Graziosetta does not qualify as a member of PMD's litigation control group; (2) § 60 of FELA, incorporated by reference into the Jones Act, bars the application of RPC 4.2; and (3) that he did not violate RPC 4.2 because he was completely unaware

that Juliano had contacted Graziosetta and had not directed him to contact Graziosetta.

It is undisputed that Barish was notified by counsel for PMD well in advance of the contact that Graziosetta was a member of PMD's litigation control group. Moreover, Barish and Juliano were aware that Graziosetta was represented by counsel for PMD at the related Coast Guard Hearings and Barish was aware that Graziosetta was represented by counsel at his deposition in the instant matter. Only now, after Juliano contacted Graziosetta, does Barish argue that Graziosetta does not fall under RPC 1.13(a)'s definition of the litigation control group.

■ This Court rejects Barish's attempted *post hoc* justification for his and his investigator's behavior as clearly contrary to public policy. The rule is clear in that once the attorney knows that the person is represented or is a member of the litigation control group he is required to seek consent of his adversary prior to contacting him. There is nothing in RPC 4.2 that permits an attorney with knowledge that the person is represented to engage in *ex parte* communications with that person without notice to the adversary and only after such communications are discovered to object on the grounds that the person is not in fact represented or part of the litigation control group. This is not a circumstance where the approaching attorney, in good faith and in the exercise of reasonable diligence, investigated and determined that the person was not represented or a member of the litigation control group. Here, the record demonstrates that Barish had knowledge that Graziosetta was represented and that PMD had designated him as a member of the litigation control group and the record is devoid of facts which would indicate that Barish or Juliano performed any in-

quiry in an attempt to prove otherwise. Under such circumstances, the Court refuses to entertain Barish's argument that Graziosetta is not properly a member of the litigation control group.

Next, Barish argues that § 60 of FELA permits contact with represented persons in violation of RPC 4.2.[5] Barish has asserted this argument without success in his prior encounters with RPC 4.2. *See Belote*, 1998 WL 136523 at *4–6 ("[Section] 60 was not intended to preempt Rule 4.2."); *Faragher v. Nat'l. R.R. Passenger Corp.*, Civ. No. 91–2380, 1992 WL 25729 (E.D.Pa. Feb. 7, 1992) (not reaching the issue); *Garrett*, 1990 WL 122911 at *2 ("[Section 60] does not authorize plaintiff's counsel to communicate with an employee *ex parte* in violation of Rule 4.2 once litigation has begun.").

Section 60 provides:

Any contract, rule, regulation, or device whatsoever, the purpose, intent, or effect of which shall be to prevent any employees of any common carrier from furnishing voluntary information to a person in interest as to the facts incident to the injury or death of any employee, shall be void, and whoever, by threat, intimidation, order, rule, contract, regulation, or device whatsoever, shall attempt to prevent any person from furnishing voluntarily such information to a person in interest, or whoever discharges or otherwise disciplines or attempts to discipline any employee for furnishing voluntarily such information to a person in interest, shall, upon conviction thereof, be punished....

45 U.S.C. § 60.

◼ At issue here is whether RPC 4.2 constitutes a rule or regulation with the purpose or intent of preventing employees from voluntarily furnishing information to a person in interest. This Court finds that RPC 4.2 is not such a rule or regulation in that it does not "prevent" employees from voluntarily furnishing information. The plain language of RPC 4.2 merely requires that counsel for represented individuals be notified and give consent before the individual is interviewed. As to members of the litigation control group, the rules specifically provide that a person may disavow representation at any time. The likely effect of RPC 4.2 is that once notified, counsel will consent but insist on being present for the interview. "While an attorney's presence in an interview may indeed be limiting, it is a substantial leap to hold that this presence deprives an employee from offering information of his or her own free will." *Belote*, 1998 WL 136523 at *5. If opposing counsel refuses to consent to an interview, the attorney is free to gain access to the individual through traditional discovery devices, such as depositions. Under these circumstances, the Court cannot conclude that RPC 4.2 prevents litigants from obtaining information, "it merely prescribes the conditions under which that information can be accessed." *Id.*

As stated by the Seventh Circuit in *Weibrecht v. Southern Illinois Transfer, Inc.*, 241 F.3d 875, 880 (7th Cir.2001), "if we read the word 'prevent' in § 60 to include the marginal deterrence imposed by Rule 4.2, we would effectively be finding that FELA and the Jones Act were intended to displace generally applicable ethical rules." There is nothing in the language or legislative history of the statute which would indicate that Congress intended the scope of § 60 to be so broad. *See id.* Thus, the Court concludes that § 60 in no way permits counsel in FELA and Jones Act cases to violate RPC 4.2.

Finally, Barish argues that he cannot be found to have violated RPC 4.2 because he

---

**5.** FELA's provisions are incorporated into the Jones Act under 46 U.S.C. § 688(a).

did not specifically direct Juliano to contact Graziosetta and he was unaware that Juliano intended to speak to him until after their conversation.

■ It is a fundamental tenet of professional responsibility that an attorney may not do through an agent that which he could not do himself. This principle is found in RPC 5.3, which provides:

With respect to a nonlawyer employed or retained by or associated with a lawyer:

(a) every lawyer or organization authorized by the Court Rules to practice law in this jurisdiction shall adopt and maintain reasonable efforts to ensure that the conduct of nonlawyers retained or employed by the lawyer, law firm or organization is compatible with the professional obligations of the lawyer.

(b) a lawyer having direct supervisory authority over the non lawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and

(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:

(1) the lawyer orders or ratifies the conduct involved;

(2) the lawyer has direct supervisory authority over the person and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action; or

(3) the lawyer has failed to make reasonable investigation of circumstances that would disclose past instances of conduct by the nonlawyer incompatible with the professional obligations of a lawyer, which evidence a propensity for such conduct.

■ Based on Graziosetta's testimony, the Court finds that Barish knew Juliano would contact Graziosetta. Moreover, Juliano testified that during his investigation in December, January and into February 2002, he regularly reported to Barish on the progress of the investigation and informed him who he had spoken to and who he planned to speak to. Juliano indicated that it was almost a month and a half between the time when he was told by Ski that Graziosetta might have information as to the particular invoices and when he actually contacted him. Incredibly, Juliano and Barish maintain that while Juliano gave regular reports to Barish, he did not tell Barish that he intended to contact Graziosetta until after such contact was made.

Even accepting Barish's version as true, he sent Juliano out to investigate without informing him that he could not contact members of PMD's litigation control group or informing him who those members were. Despite his prior experiences with RPC 4.2 and specifically with Juliano contacting a represented party in violation of RPC 4.2 in the *Belote* matter, Barish failed to properly oversee Juliano's investigation or take any measures to ensure that Juliano would not run afoul of the Rules of Professional Conduct. Under these circumstances, Barish's claimed ignorance of Juliano's conduct constitutes a clear violation of RPC 5.3. Moreover, the Court finds that Barish is responsible for Juliano's unethical conduct under RPC 5.3(c)(2) and (3).

## C. NEW JERSEY RPC 3.4(B)—COMPENSATION OF FACT WITNESSES

■ RPC 3.4(b) provides, in pertinent part that "[a] lawyer shall not ... offer an inducement to a witness that is prohibited by law[.]" Generally, lawyers may only compensate fact witnesses for: (1) reasonable expenses incurred by a witness in attending trial or testifying; or (2) reason-

able compensation for the loss of a witness' time in attending trial or testifying. *See Goldstein v. Exxon Research and Engineering Co.*, Civ. No. 95–2410, 1997 WL 580599, *1–2 (D.N.J. Feb. 28, 1997). This common law principle is codified in 18 U.S.C. § 201, the criminal statute prohibiting bribery of public officials and witnesses. Section 201 specifically provides that it does not prohibit "the payment by the party upon whose behalf a witness is called and receipt by a witness, of the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing or proceeding...." 18 U.S.C. § 201(d).

Moreover, agreements to compensate fact witnesses for expenses or services other than those specified above lack consideration and are unenforceable as against public policy. *See Hamilton v. General Motors Corp.*, 490 F.2d 223, 227–229 (7th Cir.1973); *Alexander v. Watson*, 128 F.2d 627 (4th Cir.1942); *Goldstein*, 1997 WL 580599 at *2. Courts have rejected such agreements as "lean[ing] toward the procurement of perjury; toward the raising of a class of witnesses who, for a sufficient consideration, will give testimony that shall win or lose the lawsuit; toward the perversion of justice; and toward the perversion of our courts."

Here, Barish, through his investigator, has clearly run afoul of this principle and created a clear appearance of impropriety by offering to compensate Graziosetta, a member of PMD's litigation control group and an adverse fact witness for his time at $100 per hour for reviewing documents to aid Barish in litigating the case. The record demonstrates that Barish authorized Juliano to offer compensation to fact witnesses for their assistance aside from their time lost physically attending trial and testifying and that such authorization was routine. Under that authority, Juliano contacted Graziosetta and requested that he review certain documents to aid Barish in discovering the cause of the accident. Juliano further represented to Graziosetta that he would be compensated for his time in reviewing the documents at $100 per hour for approximately two weeks and that he would not be doing anything wrong by helping Barish because he had already testified completely at the Coast Guard hearings and falsely stated that the Judge had said it was "okay" for Barish to pay him.

### D. SANCTION

Having determined that Barish violated RPCs 4.2, 5.3 and 3.4(b) the sole remaining issue before the Court is the appropriate sanction for his wrongful behavior. PMD requests that this Court disqualify Barish from this matter or revoke his *pro hac vice* admission to this Court. The Court finds that the appropriate sanction for Barish's behavior is to revoke his *pro hac vice* admission. The Court has considered the imposition of less severe sanctions, such as monetary sanctions, but such sanctions are simply inadequate to address the unethical behavior at issue.

The Court's inherent authority includes "the power to control admission to its bar and to discipline attorneys who appear before it." *Chambers*, 501 U.S. at 43, 111 S.Ct. 2123 (citing *Ex Parte Burr*, 22 U.S. 529, 9 Wheat. 529, 531, 6 L.Ed. 152 (1824)); *accord In re Tutu Wells Contamination Litig.*, 120 F.3d 368, 383 (3d Cir. 1997); *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 160 (3d Cir.1984), *cert. denied sub nom., Cochrane & Bresnahan v. Plaintiff Class Representatives*, 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985). This disciplinary power clearly extends to the conduct of counsel admitted *pro hac vice*. Local Civil Rule 104.1(h)

provides that "[w]henever an attorney applies to be admitted or is admitted to practice before this Court for purposes of a particular proceeding (*pro hac vice* ), the attorney shall be deemed thereby to have conferred disciplinary jurisdiction upon this Court for any alleged misconduct of that attorney arising in the course of or in preparation for such proceeding." *Accord* Local Civil Rules 101.1(c)(4) and 103.1, cmt. 2. Admission *pro hac vice* is a privilege, and as such, the privilege may be revoked as a sanction for unethical behavior.[6] *See Johnson v. Trueblood,* 629 F.2d 302, 304 (3d Cir.1980); *Data Systems Analysts, Inc. v. Netplex Group,* 187 F.R.D. 181 (D.N.J.1999); *Eagan v. Jackson,* 855 F.Supp. 765 (E.D.Pa.1994). As for what behavior may warrant the revocation of *pro hac vice* admission, the Third Circuit held that, "[a]t a minimum, a violation of any disciplinary standard applicable to members of the bar of the court would justify revocation of *pro hac vice* status." *Johnson,* 629 F.2d at 304.

In cases where an attorney has engaged in improper *ex parte* communications with a represented party the sanctions employed have varied from the severe sanction of disqualification, to the more lenient sanction of precluding counsel from using any information obtained through the *ex parte* contacts. *Belote,* 1998 WL 136523 (precluding counsel from using information obtained *ex parte* ); *Lennen v. John Eppler Machine Works, Inc.,* 1997 WL 566078 (E.D.Pa. Sept.5, 1997) (same); *Inorganic Coatings, Inc. v. Falberg,* 926 F.Supp. 517 (E.D.Pa.1995) (disqualifying

counsel). Cases discussing the improper compensation of fact witnesses have obviously involved a lawyer compensating his own fact witnesses, rather than adverse fact witnesses. As a sanction for such conduct courts have either precluded the paid fact witnesses from testifying or allowed the adversary to cross-examine the witness as to the agreement to impeach his credibility. *See Jamaica Time Petroleum v. Fed. Ins. Co.,* 366 F.2d 156 (10th Cir. 1966), *cert. denied,* 385 U.S. 1024, 87 S.Ct. 753, 17 L.Ed.2d 674 (1967); *Goldstein,* 1997 WL 580599 (allowing witness to testify but allowing cross-examination as to the agreement); *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non–Marine Assoc.,* 865 F.Supp. 1516 (S.D.Fla. 1994) (barring paid fact witness from testifying), *aff'd in part, rev'd in part on other grounds,* 117 F.3d 1328 (11th Cir.1997). Even a cursory examination of the instant facts indicates that Barish's conduct is more serious than these typical violations as his *ex parte* communications through his investigator in violation of RPC 4.2 and 5.3 consisted of offering compensation to an adverse fact witness. In other words, Barish's investigator did not simply engage in an improper *ex parte* conversation or offer compensation to one of Barish's fact witnesses, he engaged in *ex parte* contact and offered to pay an adverse fact witness a substantial sum to review certain documents.

Similarly, in *Rentclub, Inc. v. Transamerica Rental Finance Corp.,* 811 F.Supp. 651 (M.D.Fla.1992), *aff'd,* 43 F.3d 1439 (11th Cir.1995), the plaintiff's attor-

---

**6.** Although *pro hac vice* admission is a privilege subject to revocation, the Third Circuit has recognized the practitioner's strong interest in the privilege, and as such, has held that prior to revocation "the attorney be given a meaningful opportunity to respond to identified charges." *See Johnson,* 629 F.2d at 303. Clearly, such an opportunity was provided to Barish in the instant matter. On February 8,

2002, the Court entered an Order scheduling an evidentiary hearing for February 15, 2002 to consider PMD's allegations. The Court attached to the Order PMD's letter containing their allegations of misconduct. Barish submitted written arguments in opposition and on February 15, 2002, was given the opportunity to present witnesses and oral argument.

ney hired as a "trial consultant" a fact witness and former employee of the defendant with access to confidential information. The court found that the trial consultant agreement was an inducement to the fact witness to disclose confidential information and presented a clear appearance of impropriety in violation of the Florida Code of Professional Conduct. *Id.* at 654. Moreover, the court concluded that the *ex parte* contact with the former employee violated RPC 4.2. *Id.* at 658. As a result, the court held that the proper sanction was to disqualify plaintiff's counsel. *Id. Rentclub* is closely analogous to the case at bar and thus, informs this Court's decision.

Moreover, the presence of aggravating factors militates against the imposition of less severe sanctions. Most important is Barish's substantial prior history of misconduct recounted above. As stated by the Third Circuit, "[o]bviously, a pattern of wrongdoing may require a stiffer sanction than an isolated incident...." *Republic of the Philippines*, 43 F.3d at 74. Barish's history of misconduct in the district courts of the Third Circuit is both lengthy and well documented and has on at least two prior occasions resulted in Barish being denied *pro hac vice* admission to this court. *See supra*, at 525. More specifically, Barish has on numerous occasions been adjudged to have engaged in *ex parte* communications in violation of RPC 4.2, and on at least one occasion he did so using the same private investigator. *See supra*, at 524–25.

In denying Barish *pro hac vice* admission on prior occasions, the judges of this District have repeatedly warned Barish that his behavior must improve in order to be permitted to practice in this Court.

His behavior in this matter conclusively demonstrates that he has failed to make such improvements and thus, is not entitled to continue to practice before this Court. Although cognizant of McLaughlin's interest in retaining counsel of her choice and Barish's interest in her representation, the Court finds that Barish's conduct in the instant matter, coupled with his prior ethical missteps outweighs those interests and undoubtedly warrants the revocation of Barish's *pro hac vice* admission in the instant matter. Accordingly, the admission *pro hac vice* of Marvin I. Barish is hereby revoked.[7]

## III. CONCLUSION

For the reasons discussed above, the Court hereby Orders the revocation of the *pro hac vice* admission of Marvin I. Barish, Esquire. An appropriate form of order is filed herewith.

## ORDER

This matter comes before the Court *sua sponte* upon the Court's receipt of a letter from counsel for PMD Enterprises, Inc., alleging various ethical violations on the part of counsel for the Estate of McLaughlin, Marvin I. Barish; and the Court having heard testimony and argument on February 15, 2002; and for the reasons set forth in the Memorandum Opinion;

IT IS this day of, 2002;

ORDERED that the *pro hac vice* admission of Marvin I. Barish, Esq. to appear before this Court be and hereby is REVOKED; and it is further

ORDERED that Mr. Barish shall notify all bars of which he is a member, and any jurisdiction in which he applies for admission, of this Court's action; and it is further

---

7. The Court notes, however, that while it has revoked Barish's *pro hac vice* admission, it has not imposed the more severe sanction of disqualifying his law firm, Marvin I. Barish Law Offices, and thus, Gregory L. Nester, local counsel and associate in Marvin I. Barish Law Offices may continue as counsel for McLaughlin.

ORDERED that Mr. Barish shall notify this Court by affidavit when he provides such notification to the proper disciplinary authorities; and it is further

ORDERED that counsel appear before this Court on September 16, 2002 at 9 a.m. for a status conference.