[No. B190479. Second Dist., Div. Three. Jan. 17, 2008.]

DAVID L. SHELLER, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
FARMERS NEW WORLD LIFE INSURANCE COMPANY et al., Real
Parties in Interest.

## COUNSEL

Robert S. Gerstein for Petitioner.

No appearance for Respondent.

Fulbright & Jaworski, Richard R. Mainland, Peter H. Mason, Joshua D. Lichtman and Eric A. Herzog for Real Parties in Interest.

## OPINION

**CROSKEY, Acting P. J.**—A Texas attorney appearing *pro hac vice* for plaintiffs in a class action sent a communication to prospective class members that contained at least one misrepresentation. The trial court issued an order to show cause why the attorney's *pro hac vice* status should not be revoked. After a hearing, the trial court declined to revoke the attorney's *pro hac vice* status, and instead ordered the attorney to reimburse the defendant for substantial attorney's fees, as a condition of retaining his *pro hac vice* status. The trial court also formally reprimanded the Texas attorney. The attorney appeals. We conclude the trial court lacked authority to impose attorney's fees as a sanction and also lacked authority to issue the formal reprimand. We therefore reverse the trial court's order.[1] However, we also conclude that the

---

[1] To the extent the order is not appealable, we treat it as a writ petition and grant the petition.

trial court has the authority to revoke an attorney's *pro hac vice* status in certain circumstances, and therefore remand for further proceedings.

## *FACTUAL AND PROCEDURAL BACKGROUND*

The challenged order arises in the context of a class action against Farmers New World Life Insurance Company and Farmers Group, Inc. (collectively Farmers). The action alleges Farmers committed unfair business practices in connection with Farmers's universal life and flexible premium universal life insurance policies. Specifically, the action alleges that the insurance policies were set up so that Farmers would collect premiums from policyholders that were insufficient to keep the policies in force—resulting in either an untimely lapse of the policies or a substantial increase in premiums. The initial complaint was filed on November 5, 2003. The named plaintiff, Pauline Fairbanks, was not only a Farmers insured, but also a Farmers *agent*. At the time the complaint was filed, Fairbanks was represented by Attorney Scott A. Marks, who is a California attorney.

At the same time, Attorney David L. Sheller, who is admitted to practice in Texas,[2] was pursuing a similar class action against Farmers in Texas. On February 2, 2004, Attorney Sheller filed an application to appear *pro hac vice* as lead counsel on behalf of Fairbanks in the instant action.[3] The application was granted.

From as early as November 1, 2004, the trial court suggested that Fairbanks might not be an ideal class representative for the insureds, as she had also been a Farmers agent. In June 2005, Attorney Sheller, but not Attorney Marks, sent a written communication to some 350 Farmers policyholders, seeking additional class representatives. The letter was in the form of a flyer,[4] boldly captioned, "**Attention Farmers Insurance Group Policy Holders!!!**" The flyer began, "A potential class action lawsuit has been filed

---

[2] Attorney Sheller also appears to be licensed to practice in Alabama.

[3] Farmers challenged the application. In the Texas action, Farmers had disclosed certain materials to Attorney Sheller subject to a confidentiality agreement, pursuant to which Attorney Sheller could use the documents "for the sole purpose of matters related to this lawsuit and any other lawsuits in which a counsel of record in this lawsuit is lead counsel." Farmers asserted that confidential documents from the Texas action had been referenced in Fairbanks's action in California, in violation of the confidentiality agreement. It appeared to Farmers that Attorney Sheller moved for admission *pro hac vice*, specifically as "lead counsel" for Fairbanks, as a post hoc justification for his violation of the confidentiality agreement. Farmers sought sanctions against Attorney Sheller in the Texas action for violation of the confidentiality agreement. When its sanctions motion was denied, Farmers withdrew its opposition to Attorney Sheller's application to appear *pro hac vice*.

[4] The document's appearance was more akin to a flyer than a letter due to the fact that it was not written on attorney letterhead.

against [Farmers] in the State Court of Los Angeles County. We are concerned Farmers may have given you misleading information about this lawsuit. Our intention is to help policyholders and give them accurate information."[5] The flyer went on to state, "**If you have purchased such a policy, we may be able to help you**. We are looking for other people who have purchased such Farmers policies. If you have, you may be accepted as a 'class representative.' If accepted, you are paid for your time in an amount set by the judge." (Original boldface.)

Upon learning of this flyer, Farmers filed an ex parte motion for a temporary restraining order preventing plaintiffs' counsel from sending further precertification communications to potential members of the class, or, in the alternative, to prevent any such communications without prior court approval. Farmers's motion was based not only on the June 2005 flyer, but also on two other communications which allegedly contained factual misrepresentations about the insurance policies at issue: a September 2003 letter and a telephone survey of 500 Farmers policyholders Attorney Sheller had commissioned.[6] Farmers supported its motion with an expert declaration to the effect that both the September 2003 letter and the June 2005 flyer violated the California State Bar Rules of Professional Conduct. As to the statement in the June 2005 flyer indicating that Farmers "may have given [policyholders] misleading information about this lawsuit," Farmers submitted a declaration that it had *never* made a general mailing to its policyholders, much less a misleading one.[7]

---

[5] An item of the so-called "accurate information" in the flyer is: "FACT: Farmers has the right to increase the cost of your insurance over thirty (30) times from the time you are age 50 to age 85." This is not a fact. Farmers has the right to increase the premiums every *five* years only; thus Farmers could only increase the cost of insurance at most eight times over the 35-year period. Attorney Sheller claims that what he had intended to say was that the cost of the insurance at age 85 could be more than 30 times the cost of the insurance at age 50. This, too, was incorrect. Attorney Sheller admitted a calculation error; the cost of the insurance could, at age 85, conceivably increase to, at most, 25 times its cost at age 50.

[6] The September 2003 letter, which was sent on the combined letterhead of Attorneys Sheller and Marks, and signed by both attorneys, informed Farmers's policyholders that, if they purchased one of the challenged policies and "are paying less than the maximum premium, the chances are very high your policy will lapse." Farmers took the position that, while lapse was conceivable, there was no basis to assert the chances of lapse were "very high." The telephone survey contained some questions that were somewhat "loaded." For example, it asked policyholders, "[A] phrase in the policy says, 'the actual amount and frequency of your premium payments will affect the values and duration of your policy.' Did you understand that this means, that even if you make regular payments of the planned premiums, you could lose your insurance before age 95?"

[7] Farmers also noted that, on June 7, 2005, in an unrelated communication, Attorney Sheller wrote Farmers's counsel stating, "We are aware you sent a letter to policy holders regarding the survey. We intend to make policy holders aware of what is actually going on." Farmers's counsel submitted a declaration indicating that, having sent no such letter, he telephoned Attorney Sheller on June 20, 2005, asking if Attorney Sheller had seen any such purported

A hearing on Farmers's ex parte motion was held on July 28, 2005. Attorney Sheller was present. At the hearing, the trial court expressed concern that "there seems to be some hucksterism going on here by plaintiffs." While the trial court believed that the September 23, 2003 letter did not comply with the Rules of Professional Conduct,[8] the court was most concerned by the June 2005 flyer. Specifically, the court found the statement, "If accepted, you are paid for your time in an amount set by the judge" to be both inappropriate and simply untrue. Not only are class representatives not always entitled to recover, they may in fact be liable for court costs if the defendant prevails. Attorney Sheller responded, "As far as the [issue] of whether or not the class rep[resentative] is going to be paid or not, our contract specifically states that if we lose, they can be liable for costs of court. And without divulging any attorney communications, it is my standard practice to tell people that they can lose." The court responded that Attorney Sheller "just admitted a bait and switch to me," in that Attorney Sheller initially represented to prospective class members that they would be "paid for [their] time," but when the class members signed Attorney Sheller's agreement, they were then told that they could be responsible for costs in the event of a loss. The court believed the misrepresentation to be intentional. Attorney Sheller stated that he had no intention to mislead, and added, "I think now it will be changed. It won't happen again." The trial court restrained plaintiffs' counsel from any further precertification communications with potential classmembers without court preapproval. Finding the June 2005 flyer particularly violative of the ethical rules, the trial court, on its own motion, set an order to show cause why Attorney Sheller's *pro hac vice* status should not be revoked.

There followed substantial discovery and briefing.[9] Farmers submitted a supplemental declaration from its expert, confirming her opinion that the June

---

letter. Attorney Sheller responded that he had not seen the letter, but that he had been told by the survey company that someone at the survey company had received a copy of a letter sent by Farmers to its policyholders concerning the litigation. It would come to pass that no such letter ever came to light. Apparently, one of the telephone surveyors was told by a policyholder that the policyholder "had received a letter from Farmers regarding the class action lawsuit stating they might be contacted." While the surveyor noted this comment and gave it to her supervisor, there is no evidence that the survey company ever obtained a copy of the letter, or attempted to follow up with the policyholder in any way. In any event, we are hard pressed to see where an alleged letter from Farmers stating a policyholder "might be contacted" provides any sort of basis for Attorney Sheller's statement in the flyer that Farmers "may have given [policyholders] misleading information about this lawsuit."

[8] The court concluded the questions on the survey appeared loaded, but the court was unprepared to say that they were inappropriate.

[9] In large part, Attorney Sheller focused on his basis for making the factual representations regarding the insurance policies themselves; that is, the likelihood of the policies lapsing if the policyholders pay only the premiums they reasonably believed they needed to pay. Ultimately, the trial court did not base its order on any of these representations, choosing not to become involved with the underlying merits of the action at that time.

2005 flyer constituted an ethics violation. Farmers also submitted the declaration of a Texas ethics expert, who concluded the flyer violated Texas rules as well.

In response to the order to show cause, plaintiff Fairbanks[10] argued that the 2005 flyer was accurate "with one minor exception." Plaintiff stated her counsel now realized the statement indicating class representatives would be paid for their time was "oversimplified and incorrect." According to plaintiff's response, "[Attorney] Sheller concedes that this was in error and that he is responsible for this mistake, and he wishes to correct it immediately by a further letter to the potential class, upon the [c]ourt's approval." Plaintiff explained that the "mistake arose because several lay people looked at the notice in an effort to make it simpler and easier to understand for the average person. [Attorney] Sheller was involved with the review and should have looked at it again and given it more thought before it went out the door to 350 people. However, in the usual press of time and because he did not give extra thought to a letter before it was sent out, [Attorney] Sheller made a human mistake." As to the representation in the flyer that Farmers may have given misleading information about the lawsuit, plaintiff stated, "This sentence was placed in the letter because [Attorney] Sheller has twelve (12) years of experience in life insurance sales fraud cases. It has been [Attorney] Sheller's experience that when people learn of an alleged problem with their policy, by whatever means, most of the time they contact their agent or the home office. Many times when they call their agent or the home office, they are given inaccurate or misleading information that there is not really a problem at all. [Attorney] Sheller has experienced this in this case with policy holders who received the notice in question. This happens so frequently in these cases that it is [Attorney] Sheller's opinion that this is a general business practice in the life insurance industry."[11]

A draft "corrective notice and apology" was attached, which repeated the bulk of the text of the flyer, including the sentence, "If accepted, you are paid for your time in an amount set by the judge." However, the next paragraph, written in bold type, states, "**The sentence 'If accepted, you are paid for your time in an amount set by the judge' is inaccurate. The Court finds that sentence is an ethical violation by Plaintiff's counsel, David L.**

---

[10] The response was filed on behalf of Fairbanks, rather than on behalf of Attorney Sheller himself.

[11] Plaintiff Fairbanks also noted that the company conducting the survey had indicated that "policy holders contacted for the survey were receiving letters from Farmers telling them that a survey was being conducted and that there was a class action lawsuit," and that individuals associated with Farmers attempted to deny their association in order to take the survey, and were verbally abusive to the survey takers. Even if true, none of these facts give rise to an inference that Farmers was making misrepresentations about the lawsuit to its policyholders.

**Sheller. In actuality, you might not be paid at all and could be personally liable for court costs, if the Plaintiff loses.**" The draft corrective notice did not restate Attorney Sheller's concern that "Farmers may have given you misleading information about this lawsuit," nor did it retract that statement as ethically improper or otherwise inaccurate.

Attorney Sheller submitted the declaration of his own ethics expert opining that there is "nothing materially misleading" about the original flyer. As to the assertion in the flyer that class representatives would be paid for their time, Attorney Sheller's expert noted that Attorney Sheller conceded "that he neglected to specifically state that the judge might not award any amount." The expert concluded this was, "at worst a de minimus omission" as "it cannot be misleading or in any way improper not to have told a client what is obvious to every plaintiff, if you are not the prevailing party, you won't recover a monetary settlement." The expert then made the fairly remarkable assertion that "[Attorney] Sheller also has pointed out that he contractually obligated himself to bear any costs that might be imposed against the class representative, so that there simply was never an issue regarding the class representative's potential exposure to monetary costs." In fact, Attorney Sheller had not pointed this out at all. The only evidence before the court on this issue was Attorney Sheller's representation at the July 28, 2005 hearing, that his "contract specifically states that if we lose, they can be liable for costs of court."

A hearing was held on the order to show cause on December 2, 2005. The trial court noted that its main concern was the representation in the flyer that class representatives would be paid for their time "[i]f accepted," while, in fact, class representatives could receive nothing and, according to Attorney Sheller's retainer agreement, actually be responsible for costs. Attorney Sheller[12] argued that there was no ethical violation in the flyer, because there is no requirement that an attorney advertisement include a statement that if the client loses, there will be no recovery.[13] Farmers argued that the error was not one of mere omission, but an affirmative statement that class representatives *would* be paid for their time.

Later in the hearing, Attorney Marks argued, for the first time, that there had been no "bait and switch" because Attorney Sheller had, in fact, obligated himself to pay all costs in the event of a loss. Attorney Marks gave

---

[12] Attorney Sheller was represented by independent counsel at the hearing.

[13] In this regard, we note that Business and Professions Code section 6157.2, subdivision (d) prohibits an attorney advertisement from including a statement offering representation on a contingent basis "unless the statement also advises whether a client will be held responsible for any costs advanced by the [attorney] when no recovery is obtained on behalf of the client. If the client will not be held responsible for costs, no disclosure is required."

the court a document, which was unauthenticated and had not been previously disclosed to Farmers. The document was a one-sentence letter, purportedly written in July 2004, from Attorney Sheller to Fairbanks, reading simply, "In the unlikely event, we lose the case and there are costs that are incurred to you, I will pay them completely." When it was pointed out that this letter was in complete opposition to what had been represented at the July 2005 hearing, Attorney Marks responded that Attorney Sheller had been upset at the July 2005 hearing, and that while he had told the court what his *retainer* provided, he should have informed the court that he had promised to indemnify Fairbanks for costs, and would do the same with future class representatives.[14] The court then questioned whether it was ethical for an attorney to agree to indemnify his client for costs that might be imposed against the client; the ethics experts for both parties were in attendance and had opposing views on the issue.[15]

The trial court indicated its intention to sanction Attorney Sheller in some manner, and asked the parties for input on any possible lesser sanction to the revocation of Attorney Sheller's *pro hac vice* status. Attorney Sheller's expert had suggested, in her declaration, that "a reprimand would be the maximum penalty to be appropriately imposed in this matter." Attorney Sheller argued that the prohibition on further precertification contact with the class without court approval would be sufficient. Farmers, which had incurred over $140,000 in fees on this issue, argued that, if Attorney Sheller's *pro hac vice* status was not revoked, he should at least be ordered to compensate Farmers for its attorney's fees.

The trial court allowed one final round of briefing. Attorney Sheller admitted that the flyer was "not well written" and apologized "for his mistakes" in drafting it. He represented that there had been no "bait and switch" because, when he issued the flyer, he had already promised Fairbanks that he would pay any costs. Attorney Sheller argued that, when he had

[14] Curiously, given the declaration of Attorney Sheller's expert, Attorney Sheller had clearly remembered the existence of this agreement by the time of the opposition to the order to show cause. Nonetheless, Attorney Sheller did not submit a copy of this agreement or a declaration of himself or Fairbanks regarding it. Instead, he had submitted a draft "corrective notice and apology," which would have represented to prospective class members that they "could be personally liable for court costs" in the event of a loss—a complete falsehood according to Attorney Marks's representation that Attorney Sheller had agreed to indemnify Fairbanks for costs and would do the same for other class representatives.

[15] Subsequent to the hearing in this matter, the Professional Responsibility and Ethics Committee of the Los Angeles County Bar Association issued a formal advisory opinion that it is permissible for an attorney to agree to indemnify a client for court-ordered costs in the event the client is not the prevailing party. (L.A. County Bar Assn., Professional Responsibility and Ethics Com., Formal Opinion No. 517 (Apr. 2006).)

written that if accepted, class representatives would be "paid for [their] time in an amount set by the judge," he simply meant that an impartial judicial officer would decide "how much justice, if any[,] an injured person will receive." He argued that his flyer caused no harm, and that any complaints about the flyer were "stylistic in nature." Attorney Sheller argued that he is a passionate advocate who must be zealous in order to survive as a sole practitioner opposing a firm. He suggested that "[d]iscipline should only be administered when it is demonstrated that the attorney is representing his own interests as opposed to the clients' [interests]." As such, he argued that issuing a new flyer remedying the first flyer would be an appropriate remedy. At no point did Attorney Sheller ever suggest that the trial court lacked the authority to revoke his *pro hac vice* status, issue a reprimand, or sanction him monetarily.[16]

On February 27, 2006, the trial court issued its order discharging the order to show cause. The court stated that the June 2005 flyer "reads like a crass commercial as opposed to a professional advertisement." The court concluded that the flyer "contained at least one statement that was not true," specifically, the representation that class representatives would be paid for their time. The court also found unethical Attorney Sheller's July 28, 2005 misrepresentation in open court that his retainer agreement specifically states that plaintiffs can be liable for costs in the event the case is lost, given that Attorney Sheller had, in actuality, agreed to reimburse Fairbanks for any costs incurred in this action. The court did not accept Attorney Sheller's claim of overzealousness as an excuse, and specifically concluded that, with respect to the June 2005 flyer, Attorney Sheller had been more concerned with attracting additional clients than with representing Fairbanks's interests. While the trial court believed that Attorney Sheller's conduct would justify the revocation of his *pro hac vice* status, the court in its discretion declined to do so.[17] Instead, the court imposed on Attorney Sheller the responsibility to pay two-thirds of Farmers's attorney's fees, $95,009, as a condition of retaining his *pro hac vice* status.[18] Additionally, the trial court formally reprimanded Attorney Sheller for his conduct. Attorney Sheller filed a timely notice of appeal.[19]

---

[16] At most, he argued that he could not be ordered to pay Farmers's attorney's fees as Farmers's counsel had failed to "meet and confer" on the issue of the propriety of the flyer.

[17] The court's decision was made without prejudice to reconsidering, on a motion for class certification, whether Attorney Sheller could appropriately represent the class.

[18] The trial court concluded that all of Farmers's claimed fees were legitimate. However, as Attorney Sheller had not been permitted to challenge individual line items on Farmers's bills for reasons of confidentiality, the court reduced the fees by one-third to guarantee that the amount was fair.

[19] The trial court's order also made permanent the previous order preventing precertification communication with the prospective class members without court approval. Attorney Sheller does not appeal from this portion of the order.

## *ISSUES ON APPEAL*

We first address whether Attorney Sheller can raise any challenge to the court's legal authority to order him to pay attorney's fees to Farmers, and formally reprimand him, in light of Attorney Sheller's failure to raise these arguments before the trial court. Exercising our discretion to reach these purely legal issues, we conclude that no authority existed for the trial court's order, and that it therefore must be reversed. We also consider whether a trial court has the inherent authority to revoke an attorney's *pro hac vice* status. We conclude that such authority exists, allowing a trial court to revoke an attorney's *pro hac vice* status in, at the least, any circumstance in which it could disqualify a California attorney from a particular case. We therefore remand for the trial court to determine whether to exercise its discretion to revoke Attorney Sheller's *pro hac vice* status.

## *DISCUSSION*

### 1. *Scope of the Appeal*

On appeal, Attorney Sheller challenges the trial court's authority to order him to pay Farmers's attorney's fees, to formally reprimand him, and—although the order was not made—to revoke his *pro hac vice* status. Farmers responds that these contentions are forfeited, as Attorney Sheller never challenged the trial court's authority to make any such orders. The application of the forfeiture rule is not automatic; appellate courts have discretion to excuse such forfeiture. (*In re S.B.* (2004) 32 Cal.4th 1287 [13 Cal.Rptr.3d 786, 90 P.3d 746].) Parties have been permitted to raise new issues on appeal where the issue is purely a question of law on undisputed facts. (*Frink v. Prod* (1982) 31 Cal.3d 166, 170 [181 Cal.Rptr. 893, 643 P.2d 476].) This is an appropriate case for the exercise of such discretion. We are here concerned with the purely legal issue of the scope of a trial court's authority to sanction a foreign attorney appearing *pro hac vice*. It would be a miscarriage of justice to allow a sanction imposed without legal authority to remain in effect simply because the attorney failed to challenge it.

Farmers also contends that the order formally reprimanding Attorney Sheller is not an appealable order. Indeed, it appears that the order is not. (See Code Civ. Proc., § 904.1.) We exercise our discretion, however, to treat the notice of appeal as a petition for writ of mandate, and address the issue.

### 2. *Inherent Power of the Trial Courts*

■ In order to properly discuss the issues raised by this appeal, we must first address the inherent powers of a trial court. All courts possess inherent supervisory or administrative powers to enable them to carry out their duties. (*Bauguess v. Paine* (1978) 22 Cal.3d 626, 635–636 [150 Cal.Rptr. 461, 586 P.2d 942].) Code of Civil Procedure section 128 reflects these powers, but is not their source. That section provides, in pertinent part, that each court has the power "[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto." (Code Civ. Proc., § 128, subd. (a)(5).)

■ Prior to the enactment of the State Bar Act (Bus. & Prof. Code, § 6000 et seq.), attorney discipline was administered by the courts under their inherent judicial power. (1 Witkin, Cal. Procedure (4th ed. 1996) Attorneys, § 616, p. 727.) As originally enacted, the State Bar Act did not attempt to curtail or limit the previously existing judicial power to impose discipline. (See Bus. & Prof. Code, former § 6087 [nothing in the State Bar Act "shall be construed as limiting or altering the powers of the courts of this state to disbar or discipline members of the bar"].) However, in 1951, the State Bar Act was amended to exclude superior courts and appellate courts from exercising such jurisdiction, leaving the Supreme Court as the sole judicial entity with jurisdiction over attorney discipline. (Bus. & Prof. Code, §§ 6087, 6100; *Jacobs v. State Bar* (1977) 20 Cal.3d 191, 196 [141 Cal.Rptr. 812, 570 P.2d 1230].) Thus, in California, the inherent judicial power of the superior court does *not* extend to attorney disciplinary actions. That power is exclusively held by the Supreme Court and the State Bar, acting as its administrative arm. (*Jacobs v. State Bar, supra,* 20 Cal.3d at p. 198.)

Trial courts in California are not, however, powerless to sanction attorneys for improper conduct or to control the proceedings before them to prevent injustice. Thus, trial courts may conduct contempt proceedings, dismiss sham actions, admonish counsel in open court, strike sham pleadings, and report misconduct to the State Bar. (1 Witkin, Cal. Procedure (4th ed. 1996) Attorneys, § 620, p. 731.) In an appropriate case, the trial court may exercise its inherent power to control the conduct of its ministerial officers to disqualify an attorney in an action before it. (*In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 585 [283 Cal.Rptr. 732].) Issues of disqualification often arise when an attorney has a conflict of interest, such as when the attorney has been exposed to confidential information of a former

client who is in an adverse position in current litigation. (*Id.* at pp. 586–587; *Roush v. Seagate Technology, LLC* (2007) 150 Cal.App.4th 210, 219 [58 Cal.Rptr.3d 275].) " 'A motion to disqualify counsel brings the client's right to the attorney of his or her choice into conflict with the need to maintain ethical standards of professional responsibility.' " (*Knight v. Ferguson* (2007) 149 Cal.App.4th 1207, 1212 [57 Cal.Rptr.3d 823].) "Disqualification motions implicate several important interests, among them are the clients' right to counsel of their choice, the attorney's interest in representing a client, the financial burden of replacing a disqualified attorney, and tactical abuse that may underlie the motion. [Citation.] The 'paramount' concern in determining whether counsel should be disqualified is 'the preservation of public trust in the scrupulous administration of justice and the integrity of the bar.' [Citations.] It must be remembered, however, that disqualification is a drastic course of action that should not be taken simply out of hypersensitivity to ethical nuances or the appearance of impropriety." (*Roush v. Seagate Technology, LLC, supra,* 150 Cal.App.4th at pp. 218–219.) "The purpose of disqualification is not to punish a transgression of professional ethics. [Citation.] Disqualification is only justified where the misconduct will have a 'continuing effect' on judicial proceedings." (*Baugh v. Garl* (2006) 137 Cal.App.4th 737, 744 [40 Cal.Rptr.3d 539].)

The question has arisen as to whether the inherent power of a trial court includes the power to sanction attorneys for bad faith conduct by requiring the payment of attorney's fees. The United States Supreme Court has held that the inherent power of federal district courts encompasses this power. (*Chambers v. NASCO, Inc.* (1991) 501 U.S. 32, 44–45 [115 L.Ed.2d 27, 111 S.Ct. 2123].) In *Chambers*, the United States Supreme Court began with the premise that a federal court has the inherent power "to control admission to its bar and to discipline attorneys who appear before it." (*Id.* at p. 43.) A court's inherent powers must be exercised with restraint and discretion, and "[a] primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." (*Id.* at pp. 44–45.) The Supreme Court reasoned that, since a district court contains the inherent power to dismiss an action within its discretion, the lesser sanction of the imposition of attorney's fees is also within its inherent power. (*Id.* at p. 45.)

■ The California Supreme Court has reached the opposite result. (*Bauguess v. Paine, supra,* 22 Cal.3d at p. 637.) The California Supreme Court concluded that "[i]t would be both unnecessary and unwise to permit trial courts to use fee awards as sanctions apart from those situations authorized by statute." (*Ibid.*) The California Supreme Court acknowledged that a trial court has the power of contempt to sanction disruptive or

disrespectful attorneys, and that procedural safeguards have been enacted to govern contempt proceedings. Without such procedural safeguards in place, "serious due process problems would result were trial courts to use their inherent power, in lieu of the contempt power, to punish misconduct by awarding attorney's fees to an opposing party or counsel." (*Id.* at p. 638.) Concluding that the use of the courts' inherent power to punish misconduct by awarding attorney's fees "may imperil the independence of the bar and thereby undermine the adversary system," the California Supreme Court concluded that the power to impose such sanctions must be created by the Legislature with appropriate safeguards.[20] (*Id.* at pp. 638–639.) The reasoning of *Bauguess* has been extended to "any sanction occasioned by attorney conduct." (*Yarnell & Associates v. Superior Court* (1980) 106 Cal.App.3d 918, 923 [165 Cal.Rptr. 421] [concerned with monetary sanctions].)

### 3. *Admission* Pro Hac Vice

■ Most, if not all, states allow an out-of-state attorney to appear *pro hac vice*.[21] (*Leis v. Flynt, supra,* 439 U.S. at pp. 441–442.) However, it is not a right granted by the federal Constitution. (*Id.* at p. 442.)

California Rules of Court, rule 9.40 governs the admission of attorneys *pro hac vice* in California. An attorney who is a member in good standing of the bar of another state who has been retained to appear in a particular cause pending before a court of this state may, "in the discretion of such court" be permitted to appear as counsel *pro hac vice*. (Cal. Rules of Court, rule 9.40(a).) No person is eligible to appear *pro hac vice* if the person is a California resident, regularly employed in California, or regularly engaged in substantial business in California. (*Ibid.*) Repeated appearances *pro hac vice* constitute cause to deny an application. (Cal. Rules of Court, rule 9.40(b).) An attorney seeking to appear *pro hac vice* must file an application indicating the courts to which the applicant has been admitted, and that the applicant is

---

[20] The Legislature responded to *Bauguess* by enacting statutory provisions for a trial court to impose the sanction of attorney's fees under certain circumstances. (Code Civ. Proc., §§ 128.5, 128.7; see *Olmstead v. Arthur J. Gallagher & Co.* (2004) 32 Cal.4th 804, 809 [11 Cal.Rptr.3d 298, 86 P.3d 354].) These statutes were not relied upon by the trial court in this case.

[21] Relying on sections of the Business and Professions Code governing the admission of foreign attorneys to the California bar (Bus. & Prof. Code, §§ 6062, 6068), the United States Supreme Court suggested that California was an example of a jurisdiction that has "chosen to bar all *pro hac vice* appearances." (*Leis v. Flynt* (1979) 439 U.S. 438, 444, fn. 5 [58 L.Ed.2d 717, 99 S.Ct. 698].) California has, in fact, allowed *pro hac vice* applications, originally by common law (*In re McCue* (1930) 211 Cal. 57, 67 [293 P. 47]), and eventually, by court rule. (Cal. Rules of Court, rule 9.40, formerly rule 983, adopted 1972.)

a member in good standing in those courts. An applicant must indicate that he or she "is not currently suspended or disbarred in any court," but there is no requirement for including any history of discipline imposed.[22] (Cal. Rules of Court, rule 9.40(d).)

 While there does not appear to be a statement of the scope of a court's discretion in ruling on an application to appear *pro hac vice* in a civil case, our Supreme Court has concluded that, when a criminal defendant seeks to be represented by an attorney appearing *pro hac vice*, the court's exercise of discretion should be limited by the individual's right to defend himself in whatever manner he desires. (*Magee v. Superior Court* (1973) 8 Cal.3d 949, 952 [106 Cal.Rptr. 647, 506 P.2d 1023].) The defendant's choice of counsel should be interfered with only to avoid significant prejudice to the defendant himself or " 'a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case.' " (*Ibid.*)

While in some jurisdictions, the State Bar has no power to discipline attorneys appearing *pro hac vice* (e.g., *State Industries, Inc. v. Jernigan* (Fla.Dist.Ct.App. 2000) 751 So.2d 680, 682), an attorney appearing *pro hac vice* in California is "subject to the disciplinary jurisdiction of the State Bar with respect to any of his or her acts occurring in the course of such appearance." (Cal. Rules of Court, rule 9.40(f); see also *Birbrower, Montalbano, Condon & Frank v. Superior Court* (1998) 17 Cal.4th 119, 130 [70 Cal.Rptr.2d 304, 949 P.2d 1]; Cal. Rules of Prof. Conduct, rule 1-100(D)(2).) Additionally, once permitted to appear *pro hac vice*, a foreign attorney in California "is subject to the jurisdiction of the courts of this state with respect to the law of this state governing the conduct of attorneys to the same extent as a member of the State Bar of California."[23] (Cal. Rules of Court, rule 9.40(f).)

### 4. *Revocation of* Pro Hac Vice *Status*

No case in California has yet addressed whether a trial court has the authority to revoke an attorney's *pro hac vice* status. Numerous other courts,

---

[22] This division has previously indicated that an applicant's prior conduct is irrelevant to a trial court's ruling on application to appear *pro hac vice*. (*Walter E. Heller Western, Inc. v. Superior Court* (1980) 111 Cal.App.3d 706, 709 & fn. 4 [168 Cal.Rptr. 785].) As we are concerned with counsel's conduct *after* being granted permission to appear *pro hac vice,* we need not address the continuing validity of that holding today.

[23] California similarly subjects to the disciplinary jurisdiction of its courts and State Bar: military counsel permitted to appear (Cal. Rules of Court, rule 9.41(c)); registered foreign legal consultants (Cal. Rules of Court, rule 9.44(c)(6)–(8)); and out-of-state attorney arbitration counsel (Code Civ. Proc., § 1282.4, subd. (c)(9); Cal. Rules of Court, rule 9.43(d)).

however, have considered the issue, and determined that trial courts possess that authority. (See Annot., Attorneys: Revocation of State Court Pro Hac Vice Admission (1988) 64 A.L.R.4th 1217.) The parties have not cited to, and independent research has not disclosed, an opinion from any jurisdiction concluding that trial courts lacked the authority to revoke an attorney's *pro hac vice* status.

However, the legal basis for the authority to revoke an attorney's *pro hac vice* status has varied. Some jurisdictions expressly include the authority to revoke *pro hac vice* status in their statutes or rules allowing *pro hac vice* appearances. (See Del. Super. Ct. Rules of Civ. Proc., rule 90.1 ["The Court may revoke a pro hac vice admission sua sponte or upon the motion of a party, if it determines, after a hearing or other meaningful opportunity to respond, the continued admission pro hac vice to be inappropriate or inadvisable."]; N.C. Gen. Stat., § 84-4.2 ["Permission granted [to appear *pro hac vice*] may be summarily revoked by the General Court of Justice or any agency . . . on its own motion and in its discretion."]; Wis. Super. Ct. Rules, rule 10.03(4) ["Permission to the nonresident lawyer [to appear *pro hac vice*] may be withdrawn by the judge granting it if the lawyer by his or her conduct manifests incompetency to represent a client in a Wisconsin court or by his or her unwillingness to abide by the rules of professional conduct for attorneys and the rules of decorum of the court."].) Federal courts have concluded the authority to revoke an attorney's *pro hac vice* status is included within the inherent power of a federal court " 'to control admission to its bar and to discipline attorneys who appear before it.' " (*Lasar v. Ford Motor Co.* (9th Cir. 2005) 399 F.3d 1101, 1118; *In re Complaint of PMD Enterprises Inc.* (D.N.J. 2002) 215 F.Supp.2d 519, 530.) Finally, some courts have found the power to revoke an attorney's *pro hac vice* status within a trial court's inherent power to regulate practice before it and protect the integrity of its proceedings. (See, e.g., *Walls v. Toledo* (2006) 166 Ohio App.3d 349 [2006 Ohio 2111, 850 N.E.2d 789, 792]; *Bank of Hawaii v. Kunimoto* (1999) 91 Haw. 372 [984 P.2d 1198, 1213].)

Moreover, jurisdictions differ on the conduct of the *pro hac vice* attorney that will be sufficient to justify revocation of *pro hac vice* status. In some jurisdictions, the trial court may revoke an out-of-state attorney's *pro hac vice* status for any conduct which "adversely impacts the administration of justice." (E.g., *State Industries, Inc. v. Jernigan, supra,* 751 So.2d at p. 682 [this is a broad standard that would permit revocation of *pro hac vice* status for conduct that would be permissible by a local attorney]; *Williams & Connolly v. PETA* (2007) 273 Va. 498 [643 S.E.2d 136, 148] [conduct justifying sanctions under statute is a sufficient basis to revoke *pro hac vice*

status under this standard].) In some jurisdictions, violation of an established disciplinary standard justifies revocation of *pro hac vice* status. (E.g., *In re Complaint of PMD Enterprises Inc., supra,* 215 F.Supp.2d at p. 531.) Other jurisdictions require bad faith of the *pro hac vice* attorney before such status can be revoked. (*Baldwin Hardware Corp. v. Franksu Enterprise Corp.* (Fed. Cir. 1996) 78 F.3d 550, 562 [trial court's order prohibited counsel from appearing *pro hac vice* before it in the future].) Still other jurisdictions grant trial courts a very broad discretion, which permits revocation of *pro hac vice* status for reasons which do not amount to misconduct. (E.g., *Brown v. Wood, Judge* (1974) 257 Ark. 252 [516 S.W.2d 98, 99–101] [not an abuse of discretion to revoke an attorney's *pro hac vice* status for concerns that the *pro hac vice* attorney's extensive practice would adversely affect the trial court's ability to move its docket along].) In Ohio, the courts have not yet determined the outer limits of the trial courts' authority to revoke *pro hac vice* status, but have concluded that, at the least, conduct which would support disqualification of a local attorney is sufficient to justify revocation of a *pro hac vice* attorney's status. (*Royal Indemnity Co. v. J. C. Penney Co.* (1986) 27 Ohio St. 3d 31 [27 Ohio B. 447, 501 N.E.2d 617, 622].) In Washington, *pro hac vice* status can be revoked for conduct that constitutes contempt, adversely affects the conduct of the litigation, or violates the code of professional responsibility.[24] (*Hallmann v. Sturm Ruger & Company, supra,* 639 P.2d at p. 808.)

■ In this admittedly nonuniform state of the law, we now consider whether California trial courts have the authority to revoke an attorney's *pro hac vice* status. We consider the three legal bases that have been found by other jurisdictions to support such authority: (1) express provision in statute or rule; (2) implied in court's authority to control admission to its bar and discipline attorneys who appear before it; and (3) implied in court's inherent

---

[24] The Washington Supreme Court concluded that, when considering an *application* for *pro hac vice* status, trial courts' inquiries into the ethical conduct of the applicant should be "limited to matters which would warrant disqualification, were the attorney a member of the local bar, or which would justify discipline under the court's contempt powers." (*Hahn v. Boeing Company* (1980) 95 Wn.2d 28 [621 P.2d 1263, 1267].) The Washington Supreme Court concluded that an inquiry into whether the plaintiff's attorney had violated state disciplinary rules regarding solicitation of clients had no place in determining whether the attorney should be admitted *pro hac vice*, as those rules had no relevance to the future conduct of the trial nor did their violation prejudice the defendant. (*Id.* at pp. 1267–1268.) Two years later, the Washington appellate court concluded that the same interests that are balanced in determining whether to grant or deny an application for *pro hac vice* status are to be considered in determining whether to revoke *pro hac vice* status. (*Hallmann v. Sturm Ruger & Company* (1982) 31 Wn.App. 50 [639 P.2d 805, 807].) Nonetheless, the court determined that, in addition to the bases for *denial* of *pro hac vice* application set forth in *Hahn, pro hac vice* status could *also* be *revoked* for a violation of the state's disciplinary code. (*Id.* at p. 808.)

power to regulate practice before it and protect the integrity of its proceedings. California has no express provision granting trial courts the right to revoke an attorney's *pro hac vice* status. Unlike federal courts, California trial courts do not possess the power to control admission to the bar and discipline attorneys. But California trial courts do possess the inherent power to regulate practice before them and protect the integrity of their proceedings. In determining whether this power encompasses the authority to revoke an attorney's *pro hac vice* status, we look at the language of the governing court rule. An attorney appearing *pro hac vice* "is subject to the jurisdiction of the courts of this state with respect to the law of this state governing the conduct of attorneys to the same extent as a member of the State Bar of California." (Cal. Rules of Court, rule 9.40(f).) Given that a California trial court's inherent power includes the authority to disqualify a California attorney, and that revocation of an out-of-state attorney's *pro hac vice* status is, in effect, a disqualification of the out-of-state attorney,[25] we conclude that a California trial court's inherent powers include the authority to revoke an attorney's *pro hac vice* status when that attorney has engaged in conduct that would be sufficient to disqualify a California attorney. While it may be that a California trial court has the authority to revoke an attorney's *pro hac vice* status under other circumstances as well, we need not reach the issue of the precise limits of a trial court's authority in this appeal.

### 5. The Trial Court's Order

In this case, the trial court ordered Attorney Sheller to pay Farmers's attorney's fees. The order had no statutory basis, and the trial court could not have imposed a similar order on a California attorney. Similarly, the trial court formally reprimanded Attorney Sheller. Again, this is not a sanction that the trial court would have had jurisdiction to impose on a California attorney. Farmers suggests that, even though these sanctions could not have been imposed on a California attorney, the sanctions can be upheld in this case as *lesser* sanctions to the permissible sanction of revocation of Attorney Sheller's *pro hac vice* status. The conclusion does not follow. Indeed, it has already been established that although a trial court has the inherent power to disqualify a California attorney, it does not have the power to impose the apparently lesser sanctions of attorney's fees and a formal reprimand. There is simply no reason to conclude that, even though a trial court has the inherent power to revoke an out-of-state attorney's *pro hac vice* status, it somehow has the power to impose every conceivably lesser sanction on that

---

[25] *Hahn v. Boeing Company, supra,* 621 P.2d at p. 1267 stated that "[d]enial of permission to appear *pro hac vice* is in effect a disqualification of the attorney." (Italics added.)

attorney—especially when the trial court does not possess the jurisdiction to impose those sanctions on a California attorney. An attorney appearing *pro hac vice* submits to the "jurisdiction of the courts of this state with respect to the law of this state governing the conduct of attorneys to the same extent as a member of the State Bar of California." (Cal. Rules of Court, rule 9.40(f).) The attorney appearing *pro hac vice* does not submit to the disciplinary jurisdiction of the California courts to a *greater* extent than California attorneys. The trial court's order was error.

However, on remand, the court can also consider whether Attorney Sheller's *pro hac vice* status should be revoked. Moreover, the trial court can consider imposition of any other sanction procedurally available and justified by the facts. Specifically, but not exclusively, the court can consider whether Attorney Sheller should be reported to the State Bar for the initiation of disciplinary proceedings. (Cf. *Matter of Fletcher* (Ind. 1998) 694 N.E.2d 1143 [Indiana Supreme Court disciplines an Illinois attorney for misconduct when appearing *pro hac vice*; attorney is prohibited from appearing *pro hac vice* in Indiana for a term of two years].)

On appeal, Attorney Sheller argues that, at most, he committed a "marginal infraction," rendering the imposition of any sanctions an abuse of discretion. Here, we disagree. While we conclude that the trial court lacked jurisdiction to impose the sanctions ordered, this should in no way be interpreted as our approval of Attorney Sheller's conduct in this matter. Attorney Sheller mailed an advertising flyer to 350 of Farmers's policyholders, seeking additional class representatives and informing them, "If accepted, you are paid for your time in an amount set by the judge." This statement is completely false; it indicates to the policyholders that they would be paid "for [their] time," in other words, that they would be paid *regardless* of the outcome of the action. We also share the trial court's concern that Attorney Sheller's explanations for his conduct were contradictory and his purported justifications were wholly inadequate. While Attorney Sheller's status as a *pro hac vice* attorney does not permit the trial court to sanction him in a manner that a California attorney could not be sanctioned, we express no opinion as to whether Attorney Sheller's conduct is worthy of the sanction of revocation of his *pro hac vice* status or any other permissible sanction.

## DISPOSITION

The order requiring Attorney Sheller to pay Farmers's attorney's fees is reversed. The petition for writ of mandate with respect to the order reprimanding Attorney Sheller is granted, and the trial court is directed to vacate the order. The case is remanded for further proceedings consistent with the views expressed in this opinion. The parties are to bear their own costs on appeal.

Kitching, J., and Aldrich, J., concurred.

A petition for a rehearing was denied February 6, 2008, and the opinion was modified to read as printed above.