Filed 8/21/14  Pricaspian Development v. Ficeto CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PRICASPIAN DEVELOPMENT CORPORATION, | B239435 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC396756) |
| v. | |
| TODD FICETO et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County,

Michael C. Solner, Judge.  Affirmed.

Baker, Keener & Nahra, Robert C. Baker and R. Jeffrey Neer for Plaintiff and

Appellant.

Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg,

Gary S. Lincenberg and Thomas V. Reichert for Defendants and Respondents.

Plaintiff and appellant Pricaspian Development Corporation (Pricaspian) invested $12 million in three offshore hedge funds managed by Absolute Capital Management Holdings Limited (Absolute), a company for which Florian Homm was the Chief Investment Officer. Unbeknownst to Pricaspian, Homm also a partner with Todd Ficeto in a broker-dealer in California called Hunter World Markets (HWM). HWM not only traded stocks; it also did business as an investment banker. Homm, Ficeto, Absolute, and HWM were allegedly engaged in a complicated fraud scheme in which they used the Absolute funds to invest in small thinly-traded over-the-counter stocks, for which they themselves possessed warrants. Homm, Ficeto and HWM allegedly engaged in numerous trades of the stocks with Absolute funds on both sides of the same trade, designed to artificially inflate the prices of the stocks while also generating commissions. Defendants were then able to exercise their warrants to obtain high quantities of the stocks at prices far lower than the inflated prices at which the stocks were trading. They then sold the stocks to the Absolute funds, realizing profits.

Eventually, the scheme collapsed in September 2007, when Homm suddenly resigned from Absolute and disappeared. At that time, it was discovered that the Absolute Funds were invested in highly-overvalued positions in the small corporations. When the dust cleared, all of the Absolute funds had lost more than 50% of their value. Pricaspian had lost nearly $7 million of its $12 million investment.

Pricaspian brought the instant action against Homm, Ficeto, and HWM. Homm did not appear at trial and is not a party to this appeal.[1] The jury returned a special verdict, concluding that Homm had committed fraud. The jury also found that HWM had conspired with Homm, and was equally liable for the fraud. As we shall discuss, the jury's verdict was inconsistent as to Ficeto, and prompted the trial court to tentatively grant a new trial as to him.

However, at the request of HWM and Ficeto, the trial court delayed ruling on the new trial motion until it could hear the motion of HWM and Ficeto for judgment notwithstanding the verdict (JNOV) on the basis of insufficient evidence. Ultimately, the trial court granted that JNOV motion, on the basis that Pricaspian had failed to establish that any of the losses it had suffered were due to the defendants' wrongdoing, as opposed to market factors or other non-fraudulent causes of loss. The court denied Pricaspian's motion for new trial as moot.

Pricaspian appeals. We conclude the trial court did not err in granting JNOV. We therefore affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *Pricaspian Invests in the Absolute Funds*

Pricaspian is an oil and gas company; its president and chief executive officer is Jack Grynberg. Grynberg sought to invest some of Pricaspian's capital, and a friend recommended that he speak with Homm. Grynberg met with Homm, who made a

---

[1] For this reason, references to "defendants" refer only to Ficeto and HWM.

3

lengthy presentation to him regarding Absolute and some of the Absolute funds. Subsequently, Homm sent Grynberg various offering memoranda and disclosures regarding the funds. Grynberg agreed to invest.

While it was alleged that several misrepresentations or concealments of material facts induced Grynberg to invest, key for our purposes was that Homm had failed to disclose that he was a 50% partner, with Ficeto, in HWM. On the contrary, Homm specifically assured Grynberg that he had no interest in any broker-dealer whatsoever. Grynberg testified that he would not have invested any of Pricaspian's money in the Absolute funds had he known of Homm's interest in a broker-dealer – specifically, an interest in a broker-dealer which would be used to perform trades for the Absolute funds.

In August 2005, Pricaspian invested $3 million in the Absolute Octane Fund, $4 million in Absolute's European Catalyst Fund, and $3 million in the Absolute East/West Fund. There were several other Absolute funds which Homm managed; Pricaspian invested only in the three identified funds. In April 2006, after Pricaspian received statements indicating its investments were doing well, Pricaspian invested an additional $2 million in the Absolute Octane Fund, giving it a total investment of $5 million in that fund.

### 2. *Pricaspian's Losses*

We need not discuss the evidence of fraud in any great detail, beyond the evidence relevant to the causation of damages. The following facts, however, are not in dispute: (1) Pricaspian received regular statements indicating that the investments were

4

doing well;[2] (2) in September 2007, Grynberg learned that Homm had resigned from Absolute; (3) the stock for Absolute itself immediately dropped 70% in value; (4) Pricaspian sought to liquidate its investments in the Absolute funds; (5) this did not occur – the funds held many illiquid positions and Absolute could not cash out the investments; and (6) over the course of two years, Pricaspian received payments from the funds which totaled $5,245,239.16.

It was not until early 2009 that Grynberg learned that Homm had been a 50% partner in HWM. Thereafter, Pricaspian filed the instant action[3] and engaged in discovery to determine exactly what had become of its investment. The documentary evidence is far from complete.[4] Nonetheless, a picture of flagrant market manipulation emerges.

3. *The Market Manipulation*

The fraud occurred with respect to stocks in small corporations, known colloquially as "microcaps," which Ficeto defined as companies with capitalizations

---

[2] In May 2006, it received a statement indicating its $12 million investment had increased in value to over $16 million.

[3] In February 2011, the Securities and Exchange Commission brought suit against Ficeto, Homm, HWM, and others for violations of federal securities laws. At the trial in the instant matter, out of the presence of the jury, two individuals who had worked for HWM asserted their Fifth Amendment privilege against self-incrimination, due to ongoing criminal investigations.

[4] Pricaspian, in a motion in limine, sought terminating sanctions against Ficeto and HWM for failing to disclose documents ultimately determined to be in their possession. The motion was denied, but the jury was instructed that if a party intentionally concealed or destroyed evidence, the jury could decide the evidence would have been unfavorable to that party.

under $1 billion.[5]  These microcap stocks were not traded on any exchange.  Instead, they were considered over-the-counter stocks.  When such stocks were traded, each trade needed a specific buyer and a specific seller.  The prices for these stocks are listed on a quotation medium, such as the "Pink Sheet" or "OTC Bulletin Board."  HWM was considered a "market maker" in the microcap stocks at issue in this case.  This means that HWM *itself* maintained an inventory in the stocks, and always posted prices to buy and sell each of these stocks.

While the prices at which the microcap stocks were quoted each day were relevant to the next day's trading, the prices at which they closed at the end of every month were significant for other reasons.  Specifically, the Absolute funds, which were invested in these stocks, were valued at the end of each month.  High prices at the end of the month enabled Homm to report to investors in the Absolute funds that the values of those funds were increasing.  More than that, though, manipulating the prices of the microcaps enabled HWM to profit by the exercise of warrants.

The market manipulation scheme generally operated as follows:  (1) HWM, as investment banker, would agree to obtain funding for a new microcap; (2) HWM would obtain the funding by eliciting investments from the Absolute funds; (3) in exchange for obtaining this funding, HWM would receive a substantial commission, and warrants to obtain future stock in the corporation; (4) HWM and Absolute, together, would have the

---

[5]     Ficeto testified that the term "penny stock" would be incorrect in this case, as penny stocks are defined as those worth less than $5 per share, and some of the stocks with which we are concerned traded for more than that.

Absolute funds engage in many trades[6] of the microcap's stock, in order to raise the price of the stock and generate commissions for HWM; (5) when the stock price was high enough, HWM would exercise its warrants, obtaining more stock in the microcap at a price much lower than the "market price" which HWM itself had set; (6) HWM would then sell the stock to the Absolute funds, generating a profit.[7]

This manipulation was executed by means of a secret line of communication between HWM and Absolute. Broker-dealers are required to monitor and keep records of all of their correspondence with clients. HWM had a system to properly monitor and record all of its electronic communications. However, HWM also had a second, unmonitored, instant message system by which it communicated with Absolute. Colin Heatherington was the individual at Absolute who used the secret instant messaging system; he communicated with Tony Ahn at HWM. Frequently, at the end of the month, Heatherington would indicate to Ahn the closing prices he wanted for each of

---

[6] Ficeto testified that a "cross trade" is when the same party buys and sells shares of the same stock – in other words, when the same party is on both sides of the transaction. Interestingly, the individuals at HWM and Absolute who were involved in the trades referred to trades *between Absolute funds* as "cross" trades. In other words, those individuals did not consider trades between Absolute funds as arm's-length transactions between different legal entities (the different funds), but instead, as cross-trades in which the same party (Absolute) was on both sides of the transaction.

[7] Ficeto testified that when HWM sold its shares to the Absolute funds, it always did so at a reduced price. For example, if HWM exercised its warrant at $1.33, while the market price of the stock was $3.82, HWM would sell its shares to the Absolute funds at $1.50 or $1.75. This assumes, however, that $3.82 is a *real* market price, and not a price falsely inflated by HWM and Absolute. Indeed, if the true value of the stock was less than $1.50, HWM would still have profited at the expense of the Absolute funds – selling them a worthless stock at an inflated price.

the microcaps; Ahn would then perform the trades necessary to reach those prices. By means of this instant messaging system, Heatherington and Ahn also discussed increasing commissions on certain trades, and decreasing the commissions when other individuals at Absolute complained. It is apparent, from reviewing excerpts from the instant message records, that Heatherington and Ahn believed these instant messages would never be reviewed by regulators or made public, as their discussions of the market manipulation therein are blatant.[8]

Further details of the fraudulent scheme are unnecessary to our analysis, as we are concerned solely with the issue of damages.

### 4. *Evidence of Damages*

At trial, Pricaspian proceeded on the theory that, since Grynberg would not have invested in the Absolute funds *at all* had Homm's involvement in HWM been disclosed, Pricaspian should be entitled to recover the *entire amount* of its lost investment in the Absolute funds. Defendants argued, however, that Pricaspian should recover only the

---

[8]    For example, on July 30, 2007, Heatherington gave Ahn a list of closing prices to be obtained. He told Ahn to "buy whatever it takes" to drive the prices up. The purchases were all made by one of the Absolute funds. At one point, Ahn said he was having difficulty reaching the requested closing price of 37 cents for one of the stocks, stating, "I have bought over 150k," and that the price was not increasing. When Ahn asked if he should keep going, Heatherington said, "sure." On October 12, 2006, after Ahn informed Heatherington that a microcap had last traded at $1.75, Heatherington requested a "3 close." Ahn stated he "would probably need to do a cross [¶] is that ok?" Heatherington said it was "not a problem" and Ahn agreed to have the trade done before the close. About a week later, that same stock was trading at $4. Heatherington stated "we will need to move it back down," and Ahn agreed to "put a small cross to get it back to 3." At another time, when Ahn was having difficulty obtaining a closing price Heatherington requested, Ahn asked, "how much stock can I cross, I need to make it seem some[wh]at believable . . . ."

8

losses related to the fraud. Defendants elicited testimony that neither Grynberg nor Pricaspian's expert could testify as to whether the Absolute funds in which Pricaspian had invested had gained or lost money on the microcap stocks in which the funds had invested through HWM. Indeed, Pricaspian's expert admitted that he could not determine whether the Absolute funds gained or lost money from the market manipulation.[9]

This much is clear: the Absolute funds were invested in many stocks other than the microcaps they had invested in through HWM. Thus, some of Pricaspian's losses may have been due to a decrease in the value of other, legitimate, investments. At trial, there was no attempt to either determine the precise losses attributable to the market manipulation or to make a reasonable estimate as to the percentage of the Absolute funds' losses which were related to the manipulation.

5.    *The Trial and Verdict*

Pricaspian brought the instant action against Homm, Ficeto, and HWM. The case was tried to a jury on Pricaspian's causes of action against Homm for fraud by

---

[9]    As we shall discuss, both parties had mistaken the proper measure of damages. While Pricaspian was incorrect in believing it could recover *all of the damages* lost by its investment in Absolute funds, defendants were equally incorrect in believing Pricaspian could (if supported by the evidence) recover its share of the losses the Absolute funds, in which he invested, had suffered as a result of the market manipulation. As we shall explain, Pricaspian was only entitled to recover its *out of pocket* losses for the fraud – measured by the difference between what Pricaspian had invested and the value of what Pricaspian received *at the time of its investment*. Losses to the value of the Absolute funds as a whole were losses that could only be recovered by the funds themselves (or the shareholders in a derivative action), not by Pricaspian in an individual action.

misrepresentation, fraud by concealment, and conversion; the jury was also asked whether Ficeto and/or HWM were co-conspirators with Homm, such that they were equally responsible for Homm's torts. Finally, the jury was asked to determine whether there was clear and convincing evidence that any of the defendants had acted with malice, fraud or oppression sufficient to warrant an award of punitive damages.

The jury concluded that Homm was liable for fraud by misrepresentation, fraud by concealment, and conversion. It concluded that HWM, but not Ficeto, had conspired with Homm with respect to the fraud by misrepresentation and fraud by concealment, but not the conversion. The jury calculated Pricaspian's compensatory damages to be $1,200,000. The jury also concluded that all three defendants were liable for punitive damages – even though Ficeto had been exonerated from liability for compensatory damages. Because of this disparity, the trial court chose to solicit, and grant, Ficeto's motion for JNOV with respect to punitive damages. After a brief trial on punitive damages; the jury awarded $2 million each against Homm and HWM.

6. *Post-Trial Motions*

On August 11, 2011, Pricaspian filed a notice of intention to move for a new trial on several bases, including that the trial court erred in its disposition of the inconsistent verdicts against Ficeto. Ficeto and HWM opposed the motion. In addition, on August 29, 2011, Ficeto and HWM moved for JNOV, on the basis of insufficient evidence with respect to damages.[10]

---

[10] Pricaspian suggests that defendants' motion for JNOV was untimely, as it was filed more than 15 days after Pricaspian's motion for new trial. This is incorrect.

10

The trial court initially indicated its tentative view that Pricaspian's motion for new trial against Ficeto should be granted. The court correctly recognized that, when the jury's verdict is inconsistent, the proper remedy is for the court to reinstruct the jury and seek clarification. (*Mendoza v. Club Car, Inc.* (2000) 81 Cal.App.4th 287, 301.) Having failed to do so, the court is not permitted to choose which of two inconsistent jury findings should be disregarded. (*Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1346.) Instead, the matter must be retried. (*Lambert v. General Motors* (1998) 67 Cal.App.4th 1179, 1186.)

When the trial court indicated its intention to grant the new trial, defendants requested that the trial court first rule on their motion for JNOV, as the grant of JNOV would moot the need for a new trial. The trial court agreed, and stated that it would resolve both motions together.

Thereafter, the trial court granted defendants' motion for JNOV, on the basis that the evidence "adduced at trial, through both the plaintiff and [its] expert, did not establish that [Pricaspian] suffered any dam[a]ges due to the wrongoing of either [Ficeto

A motion for JNOV "shall be made within the period specified by [Code of Civil Procedure s]ection 659 . . . in respect of the filing and serving of a notice of intention to move for a new trial." (Code Civ. Proc., § 629.) Code of Civil Procedure section 659 provides that a such a notice is to be filed and served *either* before the entry of judgment *or* within 15 days after mailing or service of notice of entry of judgment, "provided, that upon the filing of the first notice of intention to move for a new trial by a party, each other party shall have 15 days after the service of that notice" to also file a notice. (Code Civ. Proc., § 659, subd. (a).) The 15-day period in which a party may file a notice of intention after another party has so filed is an *extension* of the statutory period, not a *limitation* thereof. Defendants' motion for JNOV was filed before entry of judgment; it was therefore timely under the statutory language.

or HWM].” Judgment was therefore entered in favor of Pricaspian against only Homm.

Pricaspian filed a timely notice of appeal.

## ISSUE ON APPEAL

The sole issue necessary for the resolution of the instant appeal is whether the trial court erred in granting JNOV for defendants. As we conclude Pricaspian failed to prove any legally cognizable damages it suffered on an individual basis, as opposed to damages suffered as a shareholder in the Absolute funds, we affirm.

## DISCUSSION

1.      *Standard of Review*

On appeal from a court's grant of JNOV, “ ‘ “the trial court may not weigh the evidence or judge the credibility of the witnesses, as it may do on a motion for a new trial, but must accept the evidence tending to support the verdict as true, unless on its face it should be inherently incredible. Such order may be granted only when, disregarding conflicting evidence and indulging in every legitimate inference which may be drawn from plaintiff's evidence, the result is no evidence sufficiently substantial to support the verdict. [¶] On an appeal from the judgment for defendant notwithstanding the verdict, the appellate court must read the record in the light most advantageous to the plaintiff, resolve all conflicts in his favor, and give him the benefit of all reasonable inferences in support of the original verdict. . . .” ’ ” (*Stubblefield Construction Co. v. City of San Bernardino* (1995) 32 Cal.App.4th 687, 703.)

In the instant case, the jury concluded that HWM had conspired with Homm and was therefore liable for his fraud. Because of the inconsistent verdict with respect to

12

Ficeto, we consider the verdict as though the jury had concluded that Ficeto was also liable for Homm's fraud.[11]  Specifically, we consider whether there is any evidence sufficient to support an award of damages against HWM and Ficeto in connection with Homm's fraud by misrepresentation or concealment.

2.     *Damages for Fraud*

"Under California law, a party asserting fraud must establish that its damages are the 'proximate' or 'legal' result of the fraudulent conduct.  [Citations.]  Moreover, California law generally limits a defrauded party to recovering out-of-pocket damages, as stated in Civil Code section 3343.  [Citation.]  The out-of-pocket rule ' "is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received." '  [Citation.]"  (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 869-870.)

When a plaintiff alleges that it has suffered damages because the defendants manipulated the price of a stock in which the plaintiff invested, the plaintiff may not recover the entire purchase price of the stock less any money it received from selling the stock.  Instead, the plaintiff is entitled to damages measured by the difference in value between the price paid by the plaintiff for the stock and its value when it was purchased.

---

[11]     Putting it another way, we consider whether any evidence could have supported a jury verdict against Ficeto for fraud, even though the jury's verdict was inconsistent on this issue.

(*Gutterman v. Gally* (1933) 131 Cal.App. 647, 652.)  This is a straightforward application of the out-of-pocket rule discussed above; it is the difference in actual value *at the time of the transaction* that determines damages.  If the stock purchased by the plaintiff in reliance on the fraudulent misrepresentation (or concealment) was, at the time of the purchase, *actually worth* what the plaintiff paid for it, the plaintiff was not damaged by the purchase "for even though [it] would not have bought [the shares] had [it] known the truth, [it] nevertheless received property as valuable as that with which [it] parted."  (*Gagne v. Bertran* (1954) 43 Cal.2d 481, 491 [discussing the rule in the context of a purchase of land].)

In this case, Pricaspian failed to establish recoverable damages for Homm's fraud (which would be imputed to Ficeto and HWM through the conspiracy finding).  Pricaspian submitted evidence that it was induced to invest in the Absolute funds by Homm's fraud; Pricaspian could therefore recover the difference between the $12 million it invested *and the actual value of the shares of the Absolute funds purchased at the time of the purchase*.  Pricaspian made no attempt to introduce evidence of this second amount.  Instead, Pricaspian took the position that, since it received only $5,245,239.16 when the funds were liquidated, its damages could be measured by the difference between those two figures.  This is incorrect.  There is no evidence that Pricaspian's shares in the Absolute funds were only worth $5,245,239.16 at the time of the investment; indeed, all of the evidence indicates that the loss in value to those shares occurred years later.  Moreover, Pricaspian introduced no evidence

14

supporting the conclusion that, at the time of its investment, the Absolute funds' shares were *not* worth the $12 million paid for them.

Pricaspian argues, however, that any failure of proof on the issue of damages should be charged against defendants, as they failed in discovery to disclose the evidence which would have enabled Pricaspian to establish specific damages. Specifically, Pricaspian argues that defendants failed to disclose the "trade tickets" for all of the trades in the microcap stocks at issue. Had the trade tickets been disclosed, Pricaspian could have determined "the exact detail for each and every trade made by HWM on behalf of [the Absolute funds] for each of the [microcaps] at issue."

Yet this argument raises a further issue. Pricaspian did not invest in the microcaps; Pricaspian invested in the Absolute funds, which, in turn, invested in the microcaps. Can Pricaspian recover, as fraud damages, its proportionate share of the losses the Absolute funds incurred through their investments in the microcaps or, in the alternative, can those damages only be recovered by the Absolute funds themselves (or in a derivative action on behalf of the funds)? The answer is indisputably the latter.

"Shareholders may bring two types of actions, 'a *direct* action filed by the shareholder individually (or on behalf of a *class* of shareholders to which he or she belongs) for injury to his or her interest *as a shareholder*,' or a '*derivative* action filed on *behalf of the corporation* for *injury to the corporation* for which it has failed or refused to sue.' [Citation.] 'The two actions are mutually exclusive: i.e., the right of action and recovery belongs either to the *shareholders* (direct action) or to the

15

*corporation* (derivative action).' [Citation.]" (*Schuster v. Gardner* (2005) 127 Cal.App.4th 305, 311-312.)

"An action is deemed derivative ' "if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock and property without any severance or distribution among individual holders . . . . " ' " (*Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1108.) "The cause of action is individual, not derivative, only ' "where it appears that the injury resulted from the violation of some special duty owed the stockholder by the wrongdoer and having its origin in circumstances independent of the plaintiff's status as a shareholder." ' [Citation.]" (*Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 124.) " 'Generally, a stockholder may not maintain an action in his own behalf for a wrong done by a third person to the corporation on the theory that such wrong devalued his stock and the stock of the other shareholders, for such an action would authorize multitudinous litigation and ignore the corporate entity.' [Citations.]" (*Grosset v. Wenaas, supra,* 42 Cal.4th at p. 1108, fn. 5.)

Thus, while we emphasize that Pricaspian did not, in fact, offer any evidence that its investments in the three Absolute funds were devalued by the trades performed in the microcaps,[12] any losses suffered by the Absolute funds could not be pursued by Pricaspian in this individual action; those losses must be pursued by the Absolute Funds

---

[12]    There was evidence that the Absolute funds were charged unnecessary commissions by HWM's numerous trades in the microcap stocks among the different Absolute funds.  There was, however, no evidence that any of the three funds in which Pricaspian was invested ultimately lost money on the investments in the microcaps themselves.

16

themselves, or by a shareholder in a derivative action. Thus, even if the jury could have properly inferred that the missing trade tickets would have established that the Absolute funds lost money on their investments in the microcaps, this would not have established damages Pricaspian could recover in this action.[13] JNOV was therefore appropriately entered.

---

[13] Pricaspian notes that defendants did not argue before the trial court that Pricaspian could not recover its proportionate share of the diminution in value of the Absolute funds as a result of the microcap trades on the basis that such damages could only be recovered in a derivative action. Pricaspian argues that defendants have therefore waived the right to contest damages based on this theory. The purported right of an individual to recover damages which may only be recovered in a derivative action is a pure issue of law. We have discretion to consider pure questions of law for the first time on appeal. (*Sheller v. Superior Court* (2008) 158 Cal.App.4th 1697, 1709.) It is appropriate to exercise our discretion to do so in this case, in which the strongest piece of evidence on which Pricaspian relied to prove damages on this theory was the inference which arises from the lack of trading tickets. In other words, Pricaspian would have us uphold a verdict of $1.2 million in compensatory damages on an untenable legal theory based on an utter absence of evidence. We decline to do so.

## *DISPOSITION*

The judgment is affirmed.  Defendants shall recover their costs on appeal.


## *NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS*



CROSKEY, J.

WE CONCUR:



KLEIN, P. J.



KITCHING, J.

18